Joseph G. WIEGEL, Plaintiff-Appellant and Cross-Respondent,†

v.

The CAPITAL TIMES COMPANY, a Wisconsin corporation, Defendant-Respondent and Cross-Appellant.

Court of Appeals

*No. 86–2239. Submitted on briefs March 23, 1988.—Decided April 21, 1988.*

(Also reported in 426 N.W.2d 43.)

† Petition to review denied.

For the plaintiff-appellant and cross-respondent the cause was submitted on the briefs of *W. Dan Bell, Jr.* and *Jeffrey D. Boldt,* and *Bell Law Offices, S.C.,* of Madison.

For the defendant-respondent and cross-appellant the cause was submitted on the briefs of *Brady C. Williamson* and *Robert J. Dreps,* and *LaFollette & Sinykin,* of Madison.

Before Dykman, Eich and Sundby, JJ.

EICH, J. Joseph Wiegel appeals from a summary judgment dismissing his libel action against The Capital Times Company, publisher of a Madison daily newspaper, *The Capital Times.* The newspaper cross-appeals from orders denying its motions (a) for partial summary judgment, (b) to dismiss Wiegel's claim for punitive damages, and (c) to strike portions of affidavits submitted by Wiegel in response to the summary judgment motions.

The dispositive issue is whether Wiegel may be considered a "public figure" with respect to a contro-

versy involving pollution of a Wisconsin lake, and thus able to recover damages for allegedly defamatory statements in a *Capital Times* article and editorial concerning the controversy only upon a showing that the statements were made with "actual malice" within the meaning of *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964). Because we conclude that the *New York Times* standard applies to Wiegel, and because there is no suggestion in the record that the article and editorial about which he complains were published with actual malice on the newspaper's part, we affirm the judgment dismissing his complaint and deem it unnecessary to discuss other issues raised on the appeal and cross-appeal.

The basic facts are not in dispute. On November 12, 1983, *The Capital Times* published an article entitled "Severe erosion may make lake draining a habit." The article described siltation and other pollution problems at Yellowstone Lake State Park in south central Wisconsin. For the second time in fifteen years, the Department of Natural Resources (DNR) was required to drain, excavate and treat the lake in an attempt to rehabilitate it as a sport fishery.

The article referred to reports by agents of the DNR, the United States Geological Survey and the United States Soil Conservation Service, stating that the pollution problems were caused by "farmers in the Yellowstone's watersheds [who] are letting their pesticides, their livestock manure, their very cropland wash into Yellowstone Lake and River ...." The article reported that, during an interview, park manager David Cline pointed to the knolls surrounding the park which were being planted in corn without following recommended soil conservation practices such as terracing or contour tillage, and identified

those lands as being chiefly responsible for the lake's problems. Wiegel was described as "one of the largest landowners in the area," and Gene Van Dyck, DNR's area fish manager, was quoted as stating that the DNR has "considered action against Joey Wiegel ... but it isn't just Joey Wiegel's mud there, I guarantee you."

The article then stated:

> According to the U.S. Agricultural Stabilization and Conservation Service, Wiegel has at least 8,000 acres of corn land in Lafayette County—some 3,000 acres surrounding Yellowstone Lake State Park from which he bulldozed trees and brush after purchasing it from the Boise Cascade Co.
>
> County Board Chairman Richard McKnight says the county has tried to persuade Wiegel to practice soil conservation. The county will pay him (and others who qualify) but "he's so large that that amount of cost sharing ($3,500 is the maximum per farmer) is insignificant to him."
>
> Wiegel consented to speak only briefly to this newspaper. The farmer said, "I told them to come out with a conservation plan. All they have to do is guarantee an income for me."
>
> Wiegel did not leave time to be asked why he feels obliged to own 8,000 acres of corn land if he cannot afford to conserve its soil.

The article concluded by describing pending regulatory and legislative proposals to promote soil conservation and curb erosion and manure pollution.

On November 23, 1983, *The Capital Times* ran an editorial on the subject entitled "Thieves of the soil." The editorial cited Yellowstone Lake as a "textbook lesson in how the irresponsible practices of some farmers are robbing the pocketbooks of us all ...." The

lake was described as a prime fishery which had become a "sea of mud" resulting in a second round of rehabilitative efforts by the DNR at a cost to taxpayers of $100,000. The editorial stated:

> The owner of some 3,000 acres surrounding the lake is one Joe Wiegel, who received nearly $1 million from the federal government's Payment in Kind (PIK) program this year[1] but cannot be bothered with what conscientious farmers have been practicing for decades: erosion control.
>
> At a very minimum, the U.S. Department of Agriculture ought to insist that farmers like Wiegel install soil conservation measures before they receive one cent in PIK money or other support. [Footnote added.]

The editorial urged the legislature to approve proposed rules designed to foster erosion and pollution control and concluded:

> But sterner tools are needed. Soil eroders are stealing the topsoil needed to grow food and ripping off the taxpayers. In any other context, the word for this sort of thing is robbery. When will government start throwing the book at the thieves of our soil?

Wiegel sued The Capital Times Company, its parent corporation, Madison Newspapers, Inc. (MNI), and six employees, claiming that the article and editorial had defamed him. He sought both compensatory and punitive damages. The defendants answered and moved for partial summary judgment dismissing the punitive damage claim, the claims against MNI

---

[1]The reference is to the assertion, reported in *The Capital Times* article, that Wiegel had received $942,380 from a federal crop subsidy program.

and the individual employees, and all claims relating to the editorial. The trial court dismissed MNI and the employees from the action and denied the remainder of the motion.

The Capital Times Company then filed a second motion for summary judgment, a motion to dismiss, and a motion asking the court to reconsider its decision on the editorial and punitive damage claims. The trial judge died while those motions were pending. The successor judge, Judge William Johnston, heard the motions and ruled that the statements in the editorial were absolutely privileged as statements of opinion. As a result, Wiegel's claim was dismissed insofar as it was based on the content of the editorial.

The trial court also held that because both the article and the editorial dealt with "subjects of legitimate and serious public interest and concern," Wiegel, even though he was a private citizen rather than a public figure, had the constitutional burden of proving that the statements were not only false, but were published with "actual malice," as that term is defined in *New York Times.*

A few weeks later, the United States Supreme Court held in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–56 (1986), that the first amendment requires courts to apply the "clear and convincing evidence" standard to test defamation claims, whether at trial or in pretrial summary judgment motions. The newspaper then renewed its motions and this time the trial court granted them, holding that the material facts were not in dispute and that, because there was no evidence that any of the statements in the article or editorial were published with actual malice, the newspaper was entitled to dismissal of the complaint

as a matter of law. The court also dismissed the newspaper's other pending motions.

Wiegel appealed, claiming: (1) that the trial court erred in applying the actual malice standard, rather than a standard based on simple negligence; (2) that the court abused its discretion by failing to set forth its reasons for reconsidering its earlier decision on the newspaper's first motion for summary judgment; and (3) that the court erred in ruling that the editorial was entitled to absolute protection as a statement of opinion. Because the trial court correctly concluded, if for the wrong reasons, that the actual malice standard applied, we affirm on that basis and it becomes unnecessary to consider Wiegel's other arguments.[2]

*New York Times,* 376 U.S. at 270, reaffirming the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," established the rule that a public official could recover damages in a defamation action against a newspaper only by showing that the allegedly defamatory statement was made with "'actual

---

[2]Wiegel's argument that the trial court abused its discretion by failing to state the reasons underlying its decision to reconsider the newspaper's earlier motions for summary judgment is based largely on his assertion that sec. 806.07, Stats., applies to such a decision, and that the several statutory criteria for vacation of judgments must be considered and balanced by the court in deciding a reconsideration motion. We disagree. The power to reconsider a decision is not granted by sec. 806.07. It is among the court's inherent powers. *See Eisenberg v. ILHR Department,* 59 Wis. 2d 98, 103–04, 207 N.W.2d 874, 877 (1973).

In any event, we have reviewed the trial court's decision on the motions. It occupies thirty pages in the record and discusses the parties' positions, the law and the facts at considerable length, and it outlines the reasoning underlying the ultimate decision. We see no abuse of discretion.

malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80.

Those who debated and framed the constitution firmly believed that public discussion of public issues should be a fundamental principle of American government. This historic commitment to robust debate is based on the desire to ensure that the widest possible range of information, from diverse and sometimes antagonistic sources, and the fullest possible interchange of ideas, may be brought to bear on matters affecting the public interest. It is based, too, on the belief that the best means of securing desired action and social change "lies in the opportunity to discuss freely supposed grievances and proposed remedies," and that the best protection against a bad idea is a good one. *Whitney v. California,* 274 U.S. 357, 375–76 (1927) (Brandeis, J., concurring). As a result, it has always been "a prized American privilege to speak one's mind, although not always with perfect good taste," on public issues and institutions. *Bridges v. California,* 314 U.S. 252, 270 (1941) (footnote omitted). Indeed, Justice Black wrote: "Freedom to speak and write about public questions is as important ... as is the heart to the human body. In fact, this privilege is the heart of our government. If that heart be weakened, the result is debilitation; if it be stilled, the result is death." *Milk Wagon Drivers U. v. Meadowmoor Dairies,* 312 U.S. 287, 301–02 (1941) (Black, J., dissenting).

Wisconsin law has always favored free criticism and discussion of public issues, recognizing that "[t]he freedom of speech and ... press are two of our most jealously guarded and basic constitutional rights." *State ex rel. Gall v. Wittig,* 42 Wis. 2d 595, 606, 167

N.W.2d 577, 582 (1969). More than seventy years ago the supreme court recognized that press criticism is "the best security for the proper discharge of public duties." *Arnold v. Ingram,* 151 Wis. 438, 457, 138 N.W. 111, 119 (1913) (citation omitted). And in doubtful cases "the doubt should be resolved in favor of free criticism and discussion." *Grell v. Hoard,* 206 Wis. 187, 193, 239 N.W. 428, 430 (1931). We, of course, follow the *New York Times* rule. *Dalton v. Meister,* 52 Wis. 2d 173, 183, 188 N.W.2d 494, 499 (1971), *cert. denied,* 405 U.S. 934 (1972).

Wiegel argues, however, that the "actual malice" standard applies only to public officials or public figures and that he, as a private citizen, may recover damages for defamation upon a lesser showing of ordinary negligence on the newspaper's part, citing *Denny v. Mertz,* 106 Wis. 2d 636, 318 N.W.2d 141, *cert. denied,* 459 U.S. 883 (1982).[3] We agree with Wiegel that, under *Gertz v. Welch,* 418 U.S. 323, 347–48 (1974), states are free to set their own standards of proof in media libel actions brought by private individuals. We do not agree, however, that *Denny v. Mertz* sets the Wisconsin standard as one of simple negligence in all such cases.

In that case, Denny, a shareholder in a large Milwaukee corporation, became involved in a cam-

[3]Wiegel also cites several cases from other jurisdictions and an A.L.R. annotation in support of his argument that the majority of courts have applied the negligence standard to media defamation suits commenced by private citizens. Wiegel describes those cases as holding that actual malice is not required for "private figure plaintiffs." Because we hold that Wiegel was a limited purpose public figure for purposes of comment on the controversy surrounding the pollution and drawdown of Yellowstone Lake, cases involving wholly private figure plaintiffs are inapposite.

paign to oust the company's executive officer, Orville Mertz. Mertz eventually resigned and, during an interview with a business magazine writer, stated that Denny's employment with the company had been terminated. When the magazine article reported that Denny had been "fired," he sued Mertz and the publisher for libel. The trial court granted summary judgment for the defendants on grounds that Denny was a "public figure" and thus was required to prove actual malice in order to recover. The court of appeals reversed, and, on review, the supreme court agreed, holding that Denny was not a public figure *and* that the corporate dispute was not a matter of public concern or controversy. *Denny,* 106 Wis. 2d at 650–51, 318 N.W.2d at 148.

We believe *Denny* is not persuasive on the issues before us. First, the controversy over the pollution problems at Yellowstone Lake State Park concerned issues of substantial public interest. The *Denny* court, on the other hand, specifically held that no public issue or controversy was involved in that case. Second, we believe that Wiegel, though a private citizen, became a "public figure" with respect to the Yellowstone Lake controversy within the meaning of both *Gertz* and *Denny.*[4]

---

[4]As indicated, the trial court held that Wiegel was not a public figure, but nonetheless applied the actual malice standard. We, of course, disagree. But because we conclude that Wiegel was a limited purpose public figure, the trial court's result—application of the actual malice standard—was correct.

Wiegel suggests that we may not independently review the question of whether he was, or was not, a private figure. We disagree. Findings of constitutional fact are always subject to *de novo* review in a defamation action. *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 508 n. 27, *reh. denied,* 467 U.S. 1267 (1984).

The constitutional privilege in defamation actions varies with the law's interest in protecting a plaintiff's reputation. That interest is strongest where the plaintiff is a purely private individual not involved in any matter of public interest or controversy. It is weakest when the plaintiff is a government official or a public figure—a private citizen who, by assuming a "role[] of especial prominence in the affairs of society ... [has] invite[d] attention and comment." *Gertz,* 418 U.S. at 345. Such persons, like public officials, rightly run "the risk of closer public scrutiny than might otherwise be the case." *Id.* at 344.

The United States Supreme Court first recognized this principle in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155, *reh. denied,* 389 U.S. 889 (1967), a case extending the *New York Times* rule to "public figures"—those persons who, although not government officials, are nonetheless "intimately involved in the resolution of important public questions ...." *Curtis,* 388 U.S. at 164 (Warren, C.J., concurring). Because of the importance of public debate on issues of public significance, the actual malice standard is applied to press comment on the actions and activities of people involved in those issues.

> Our citizenry has a legitimate and substantial interest in the conduct of such persons, and freedom of the press to engage in uninhibited debate about their involvement in public issues and events is as crucial as it is in the case of "public officials." The fact that they are not amenable to the restraints of the political process only underscores the legitimate and substantial nature of the interest, since it means that public opinion may be the only instrument by which society can attempt to influence their conduct. *Id.*

One may become a public figure in two ways. He or she may be a public figure for all purposes due to general fame or notoriety. More commonly, however, one assumes that status by involvement in a particular public issue or controversy and thereby becomes a public figure for a limited range of issues. *Gertz,* 418 U.S. at 351. To fit the first category, the person must be a "well-known 'celebrity,' his [or her] name a 'household word'"—a person whose words and deeds are followed by the public "because it regards his [or her] ideas, conduct, or judgment as worthy of its attention ...." *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1294 (D.C. Cir.), *cert. denied,* 449 U.S. 898 (1980) (footnote omitted). We do not believe Wiegel meets this test.

However, a person, though not generally famous or notorious, may become a public figure for a "limited purpose" because of his or her involvement in a particular public controversy. And the Wisconsin Supreme Court has agreed that whether a plaintiff is "a 'public figure for all purposes' or a 'public figure for a particular controversy,'" he or she must establish that the media defendant acted with actual malice in order to prevail in a defamation action. *Lewis v. Coursolle Broadcasting,* 127 Wis. 2d 105, 119, 377 N.W.2d 166, 172 (1985) (citation omitted).

In order to determine whether one may be considered a public figure for a limited purpose, the federal courts have developed a three-step inquiry. In *Tavoulareas v. Piro,* 817 F.2d 762, 772–73 (D.C. Cir.), *cert. denied,* — U.S. —, 98 L. Ed. 2d 151 (1987), the court, relying on similar language in *Waldbaum, supra,* outlined that test as follows:

Although few persons attain the level of notoriety to be public figures in all contexts, many individuals may be public figures for the more limited purpose of certain issues or situations. *Waldbaum* sets out a three-step inquiry to identify these limited-purpose public figures. First, we isolate the controversy at issue, because the scope of the controversy in which the plaintiff involves himself [or herself] defines the scope of the public personality. The controversy must be public both in the sense that "persons actually were discussing" it, and that "persons beyond the immediate participants in the dispute [are likely] to feel the impact of its resolution." Second, we examine the plaintiff's role in the controversy, to be sure that it is more than "trivial or tangential." An individual does not forfeit the full protection of the libel laws merely by stating a position on a controversial issue if he or she is not a principal participant in the debate or is unlikely to have much effect on its resolution. Finally, we determine if the alleged defamation was germane to the plaintiff's participation in the controversy. [Citations omitted; bracketing in original.]

In *Denny v. Mertz,* the Wisconsin Supreme Court phrased the inquiry somewhat differently, relying on language in *Gertz* emphasizing the "voluntariness" of the plaintiff's involvement in the controversy.

[W]e consider the following criteria applicable to whether a defamation plaintiff may be considered a public figure. First, there must be a public controversy. While courts are not well-equipped to make this determination as pointed out in *Gertz,* the nature, impact, and interest in the controversy to which the communication relates has a bearing on whether a plaintiff is a public figure. Secondly,

83

the court must look at the nature of the plaintiff's involvement in the public controversy to see whether he [or she] has voluntarily injected himself [or herself] into the controversy so as to influence the resolution of the issues involved. Factors relevant to this test are whether the plaintiff's status gives him [or her] access to the media so as to rebut the defamation and whether plaintiffs should be deemed to have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." *Denny,* 106 Wis. 2d at 649–50, 318 N.W.2d at 147–48, quoting *Gertz,* 418 U.S. at 344–45. [Footnote omitted.]

We note, however, the *Gertz* court itself recognized that "voluntary injection" into a controversy is only *one* way of becoming a limited purpose public figure: "More commonly, an individual voluntarily injects himself [or herself] *or is drawn into* a particular public controversy and thereby becomes a public figure for a limited range of issues." *Id.,* 418 U.S. at 351 (emphasis added). Professor Tribe agrees, concluding that, under the cases, there are three categories of "public persons": (1) those who have "general fame and notoriety in the community"; (2) those who have "voluntarily injected themselves into a public controversy"; and (3) "involuntary public figures"—those who are "involved in or directly affected by the actions of public officials." Tribe, *American Constitutional Law* 880 (2d ed. 1988) (citations and footnotes omitted). For the latter category, Tribe offers the example of a magazine seller arrested by police for distributing obscene literature as "an involuntary public figure with respect to reports or comments about the arrest." *Id.*

We agree with this analysis and believe that the focus of the inquiry should be on the plaintiff's role in the public controversy rather than on any desire for publicity or other voluntary act on his or her part. The purpose served by protecting the press from defamation suits for comment on public issues and the people involved in those issues could well be frustrated if the individuals could, by themselves and wholly independent of their involvement in the controversy, determine whether they are, or are not, "public figures."

> Comment upon people and activities of legitimate public concern often illuminates that which yearns for shadow. It is no answer to the assertion that one is a public figure to say, truthfully, that one doesn't choose to be. It is sufficient ... that "[the plaintiff] voluntarily engaged in a course that was bound to invite attention and comment." *Rosanova v. Playboy Enterprises, Inc.,* 580 F.2d 859, 861 (5th Cir. 1978). [Citation omitted.]

The trial court concluded that Wiegel was a private, not a public, figure because he was a "reluctant participant in the public controversy generated by the DNR's concern over the water quality in Yellowstone Lake ...." We consider the conclusion to be legally erroneous because we believe Wiegel's desire—or lack of desire—to draw attention to himself is irrelevant. *Lewis,* 127 Wis. 2d at 117, 377 N.W.2d at 171.

Even if Wiegel did not consciously or voluntarily thrust himself into the dispute, he may nonetheless be a limited purpose public figure if his activities "almost inevitably put him into the vortex of a public controversy." *McDowell v. Paiewonsky,* 769 F.2d 942, 950 (3d Cir. 1985). In *Dameron v. Washington Magazine, Inc.,*

779 F.2d 736, 742–43 (D.C. Cir. 1985), *cert. denied,* 476 U.S. 1141 (1986), the court held that an air traffic controller, who wholly involuntarily and "[b]y sheer bad luck" was thrust into a central role in a controversy surrounding a plane crash, was an "involuntary public figure for the very limited purpose of discussion of the ... crash." As a result, he was required to prove actual malice in order to prevail in a libel action based on statements about his role in the crash appearing in a magazine article.

We thus turn to the first step in the *Waldbaum/Tavoulareas* analysis—determining whether the events surrounding the pollution and drawdown of Yellowstone Lake constituted a public controversy. The trial court found that soil conservation and erosion have been issues of public concern for many years and that the effect of erosion on water quality is a matter of great societal interest. Wiegel does not challenge that ruling, and we believe it was proper. Indeed, a public controversy was inevitable when the DNR determined that soil erosion and the resulting siltation and pollution problems caused by the agricultural] practices of Wiegel and other area farmers required extensive and expensive efforts by the government to save Yellowstone Lake and the surrounding state parklands as valuable recreational resources.

■

It also was inevitable that the controversy would focus on Wiegel, the farmer with the largest acreage in the area. We note, for example, that the *Wisconsin State Journal,* a newspaper of statewide circulation, had published an article several months earlier that specifically discussed DNR's efforts to persuade Wiegel to adopt recommended soil conservation practices in the Yellowstone Lake area—including the threat of

a pollution lawsuit should he fail to do so. Wiegel's resistance to DNR's cleanup efforts, and his position on the merits of the dispute—that he would not resume soil conservation practices on his land if it might lower his income—were well-documented in the *Journal* article. We are satisfied that the issues discussed in *The Capital Times* article and editorial related to a public controversy.

■

We are also satisfied that Wiegel's role in the controversy was far more than "trivial" or "tangential." *Tavoulareas,* 817 F.2d at 773. While he was but one of several farmers in the watershed, his was by far the largest farm in the area, and he was the subject of public threats of DNR legal action to force him to cease cultivating his lands in a manner causing pollution of the lake. Wiegel was the central figure in the controversy, and the statements in the article and editorial describing his agricultural practices were germane to the public dispute over the conditions leading to the drawdown of Yellowstone Lake.

When Wiegel first purchased his land, comprising some 2,400 acres on the north side of the lake, he publicly stated his intention to use appropriate soil conservation practices. His acquisition of such a large tract of land, and his statements about the manner in which he proposed to use it, were reported in the press as far away as Milwaukee. He concedes that he soon abandoned those plans and discontinued using the conservation methods employed by his predecessors. As a result, soil erosion increased and state and local officials attempted to persuade him to implement sound conservation practices, which he consistently declined to do. As a result, voluntarily or not, he

became the center of the controversy over the pollution of Yellowstone Lake.

We conclude, therefore, that the test for determining whether Wiegel was a limited purpose public figure under *Waldbaum, Tavoulareas, Rosanova,* and similar cases has been met. There was a controversy of substantial statewide public interest affecting persons beyond the immediate participants in the dispute. Wiegel's role in the controversy was neither trivial nor tangential. It was substantial; and the statements in the article and editorial were germane to his central position in the dispute. It follows that the trial court correctly ruled that Wiegel was required to prove actual malice in order to recover.

We believe this conclusion is also consistent with the statement in *Denny* that a plaintiff's "access to the media" for purposes of rebutting the alleged defamation is relevant to his or her status as a public figure. *Id.,* 106 Wis. 2d at 650, 318 N.W.2d at 148. As we have said, the *Denny* court's emphasis on the "voluntariness" of the plaintiff's entry into the public fray focused on only one aspect of the issue as framed in *Gertz,* the case cited as authority for the statement in *Denny.* In light of the above-quoted language from *Gertz* and later federal cases such as *Tavoulareas, McDowell,* and *Rosanova*—and the Wisconsin court's recent decision in *Lewis*—we believe that voluntariness should no longer be considered the touchstone in limited public figure determinations. Even so, we believe that the *Denny* court's concern about a defamation plaintiff's media access has been met in this case.

The earlier *Wisconsin State Journal* article reported at length on the lake drawdown and traced

Wiegel's long-running dispute with the DNR over his agricultural practices. Among other things, it pinpointed erosion from Wiegel's farm as contributing "more than [his] share of silt into Yellowstone Lake." Wiegel was interviewed for the article, and the *Journal* printed his side of the dispute. He was quoted as saying that it was unfair to single him out among all farms in the area whose soil runoff entered the lake, and that while he was trying to prevent erosion, he could not afford to use practices that would reduce his income from the land. He indicated his willingness to adopt soil conservation practices recommended by DNR as long as the land would continue to provide him with an adequate "cash flow."

Wiegel was also interviewed for *The Capital Times* article. He was contacted by the article's author and offered the opportunity to respond. He said that he would take corrective conservation measures only if his income would not suffer and then ended the conversation, stating that he did not wish to discuss the matter further. His statement was reported in the article. After the article appeared, Wiegel continued to be contacted by the press, and he took the opportunity to publicize his side of the dispute in subsequent articles appearing in the *Wisconsin State Journal* (May 18, 1984), the *Dubuque Telegraph Herald* (January 19, 1984), and in the magazine *The Country Today* (March 1, 1984). He had ample access to the media to rebut the assertions in *The Capital Times* article and editorial.

Under any view, Wiegel was a public figure for the limited purpose of the matters relating to the controversy surrounding the pollution and drawdown of Yellowstone Lake. The dispute was one of significant statewide interest, as is evidenced not only by the

nature of the controversy itself, but also by the wide-ranging media coverage of the conditions and events leading up to the drawdown and Wiegel's role in those events. As the central figure in the dispute, with proven access to the media to air his side of the story, he became a "public figure" with respect to the Yellowstone Lake pollution controversy. As such, he may assert a claim for libel against a newspaper for printing factual and editorial commentary on the dispute only upon a showing that the statements were published with knowledge that they were false, or with reckless disregard as to whether they were false or not. We agree with the trial court that, as a matter of law, this is not such a case.

*By the Court.*—Judgment affirmed.