BAY VIEW PACKING COMPANY and Reinhard Liebner, Plaintiffs-Appellants,

v.

Jerry TAFF, Marty Burns Wolfe, Colleen Henry, WISN TV, Division of Hearst Corporation, Hearst Corporation and Dennis Vlasak, Defendants-Respondents.

Court of Appeals

*No. 95–0901. Oral argument October 3, 1995.—Decided December 12, 1995.*

(Also reported in 543 N.W.2d 522.)

655

660

For the plaintiffs-appellants the cause was submitted on the briefs of *Robert E. Sutton* of *Sutton & Kelly*, of Milwaukee, with oral argument by Robert E. Sutton.

For defendants-respondents Jerry Taff, Marty Burns Wolfe, Colleen Henry, WISN TV and Hearst Corporation, the cause was submitted on the briefs of *Matthew J. Flynn, Jeffrey O. Davis, Kevin P. Crooks*, and *Katherine H. Grebe* of *Quarles & Brady*, of Milwaukee, with oral argument by Matthew J. Flynn.

For defendant-respondent Dennis Vlasak the cause was submitted on the briefs of *Grant F. Langley*, city attorney, and *Susan E. Lappen*, assistant city attorney.

Before Wedemeyer, P.J., Sullivan and Schudson, JJ.

SULLIVAN, J. Bay View Packing Company, a Wisconsin food processor, and Reinhard Liebner, Bay View Packing Company's president and owner, collectively appeal from a summary judgment dismissal of their defamation claims against television anchors Jerry Taff and Marty Burns Wolfe; television reporter Colleen Henry; WISN TV; the Hearst Corporation, WISN TV's corporate parent; and Dennis Vlasak, an

environmental health specialist with the City of Milwaukee. The primary issue before this court is whether Bay View Packing is a limited purpose public figure for purposes of Wisconsin defamation law. We affirm the trial court's summary judgment dismissal of the claims against the WISN TV defendants because the summary judgment materials establish that: (1) Bay View Packing was an *involuntary* limited purpose public figure with respect to the alleged defamatory statements; and (2) Bay View Packing's summary judgment materials fail to raise a genuine issue of material fact that the WISN TV defendants acted with actual malice when making the alleged defamatory statements. Further, we affirm the trial court's summary judgment dismissal of the claim against Vlasak because we conclude that the summary judgment materials establish that the alleged defamatory statements made by Vlasak were substantially true.

## I. BACKGROUND.

### A. *Overview.*

This case arises out of WISN TV's television coverage on the parasitic contamination that beset the City of Milwaukee's municipal water supply during the spring of 1993. In early April 1993, undetected *cryptosporidium* protozoans entered the water supply and shortly thereafter hundreds of city residents reported severe cases of digestive illness.[1] As reported

---

[1] *Cryptosporidium* are minute protozoans that are "parasitic in the intestinal tracts of many different vertebrates, including reptiles, birds, and mammals and are an uncommon cause of diarrhea in humans." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 400 (28th ed., 1994). Infection with the protozoans is known as *cryptosporidiosis. Id.* Infection in "immunocompetent

cases of the illness spread throughout the metropolitan area, the City began to investigate for possible causes of the outbreak. On April 7, after tests on eight individuals struck with the digestive illness confirmed the presence of *cryptosporidium*, City of Milwaukee Mayor John O. Norquist issued a boil advisory for any Milwaukee residents drinking or using Milwaukee municipal water in food preparation. On April 8, the Wisconsin Department of Agriculture, Trade, and Consumer Protection issued a food handling advisory to Milwaukee-area businesses using unheated water in either food processing, as a food ingredient, or in cleaning food preparation utensils. In addition, the advisory *"strongly recommend*[ed] *that the* [businesses] *recall and dispose of all ready-to-eat food products processed with water distributed by the Milwaukee water utility* unless [the] ready-to eat food was fully cooked or the water used was boiled or appropriately filtered." (Emphasis in original.)

During April 1993, Bay View Packing, a Milwaukee-based company, processed and pickled food products using untreated municipal water including: pickled eggs, pork feet, pork hocks, cooked turkey gizzards, and polish sausage. On April 15, the United States Food and Drug Administration specifically

persons . . . causes a self-limited diarrhea syndrome," however, in "immunocompromised patients" infection causes "prolonged debilitating diarrhea, weight loss, fever, and abdominal pain, with occasional spread to the trachea and bronchial tree." *Id.*

According to the WISN TV defendants' uncontroverted summary judgment materials, by the end of the outbreak, an estimated 400,000 Milwaukee residents contracted *cryptosporidiosis*, allegedly causing severe digestive illness in most and allegedly leading to the death of over fifty residents with weakened immune systems.

requested that Bay View Packing recall its food products. On April 16, the United States Department of Agriculture informed Bay View Packing that it should recall its food products, and late that afternoon, the company began to call its distributors.[2] On Monday, April 19, Bay View Packing mailed written notices to its distributors, telling them to recall the products.

Later, on April 19, during the 6:00 p.m. and 10:00 p.m. newscasts, WISN TV broadcasted the following stories as reported by Henry, and as read by WISN TV's news anchors, Taff and Burns Wolfe: Channel 12 6:00 News:

> TAFF: *Last week we told you the FDA asked Milwaukee food producers to voluntarily recall any products they made with bad water.*
> WOLFE: *Now we have learned one Milwaukee company completely disregarded that call.*
> COLLEEN HENRY: *Well Marty and Jerry the honor system apparently failed for one Milwaukee food producer. The FDA says the Bay View Packing Company never stopped using bad Milwaukee water to pickle its products. Those foods are produced under the Bay View and Lake Side labels. They included pickled eggs, pork feet, pork hocks, cooked turkey gizzards and polish sausage. Today inspectors from the Milwaukee Health Department scoured the City in search of Bay View products still on the shelves.*
> DENNIS VLASAK: *It's either Bay View or Lake Side. That's pickled eggs, pickled pigs feet or cooked turkey gizzards.*
> COLLEEN HENRY: *The FDA said it asked Bay View to pull its pickled products last Monday because they don't heat water used in the processing*

---

[2] Both the FDA and USDA had jurisdiction over different segments of Bay View Packing's product line.

*but today inspectors found pickled pigs feet ready for purchase and pulled them from stock. It's no surprise to Carla Hegman the honor system failed. When she heard she'd have to have faith in Milwaukee manufacturers she started buying food made out of town.*

CARLA HEGMAN: No, I don't trust them, no, I think they should have taken it off just because alot [sic] of my friends got really sick from this, really sick.

COLLEEN HENRY: *Now the president of Bay View wouldn't talk on camera but he says they are cooperating with the FDA and USDA. Reinhard Liebner says while the company continued to make products with Milwaukee water he says no product made after the boil advisory ever hit the shelves.*

## Channel 12 10:00 News:

WOLFE: *We can now drink our water but we continue to watch for the aftereffects and today the health department figured thousands of us maybe as many as 232,000 could have been sick from our crypto contamination. And now we have found out at least one Milwaukee food producer has not pulled their products from store shelves.*

TAFF: *As they had been asked to do if they used bad water and they apparently did during some production process. The FDA calls it bad faith after they asked the things be voluntarily taken off the shelves and recalled. Colleen Henry went along this afternoon as health inspectors pulled the products of that local company physically off the local shelves.*

COLLEEN HENRY: *He went in search of pickled pigs feet, a Milwaukee inspector in hot pursuit of potentially tainted food.*

DENNIS VLASAK: *It's either Bay View or Lake Side pickled eggs, pickled pigs feet or cooked turkey gizzards.*

COLLEEN HENRY: *The FDA said it asked Bay View Packing to pull its pickled products from the shelves last May* [sic].[3] *Today health inspectors had to do it for them saying the company was shipping risky food across the country. Bay View officials wouldn't talk on camera but say they're cooperating with the FDA and USDA though they say such a nationwide recall is not an overnight process. They add so far they've had no report of any food related illness.*

DENNIS VLASAK: *Bay View they've got the USDA and FDA to contend with.*

COLLEEN HENRY: *Dennis Vlasak spent the day going from store to store pulling Bay View products. He says so far they're the only products the health department has had to remove. But Carla Hegman doubts they'll be the last. When she heard she'd just have to trust Milwaukee food makers to pull their products she started buying food made someplace else.*

CARLA HEGMAN: No, I don't trust them, no, I think they should be taken off just because a lot of my friends got really sick from this, really sick.

COLLEEN HENRY: *Despite FDA claims Bay View's president says no product made after the boil advisory ever hit the shelves. Besides the staffs' been eating the food and he says none of them's sick. Colleen Henry, Channel 12 News, Milwaukee.*

TAFF: *The foods produced by Bay View are sold under the Bay View and Lake Side labels. They*

---

[3] The parties agree that Henry's use of the term "May" was misstatement that has no bearing on the dispositive issues in this case.

*included pickled eggs, pork feet, pork hocks, cooked turkey gizzards and polish sausage.*

(Transcript from complaint; alleged defamatory statements of each defendant have been emphasized.)

### B. *Bay View Packing's and Liebner's Defamation Action.*

On May 12, 1993, Bay View Packing and Liebner filed a defamation suit against the WISN TV defendants and Vlasak, alleging that they "negligently, intentionally and maliciously with reckless disregard for the truth of their statements did defame the plaintiffs" in the April 19, 1993, newscasts. Bay View Packing and Liebner alleged that the "entire context of the statements made [during the newscasts] were false and defamatory in that they depicted the plaintiffs as defying governmental regulatory agencies in shipping contaminated food products throughout the United States." The WISN TV defendants admitted in their answer that they made the statements attributed to them in the complaint, but denied the remaining allegations in the complaint. Further, they pleaded the following affirmative defenses: the complaint failed to state a claim upon which relief could be granted; the statements alleged to be defamatory were true; the statements were privileged as a matter of law; one or both of the plaintiffs were public figures and the statements were not made with actual malice; and the statements "were not of and concerning one or both of the plaintiffs." The City, representing its employee Vlasak, admitted that Vlasak made the statements, but denied that they were defamatory or false. Both the WISN TV defendants and the City moved for summary judgment dismissal of the suit.

During the course of discovery, the following facts were revealed. During his deposition, Liebner admitted that he was aware of Mayor Norquist's boil advisory on April 7, and that he spoke to his USDA inspector about it. Further, he admitted that he received the State food advisory letter on April 13 asking Bay View Packing to recall its products and that he then spoke with the state agency on April 14. He stated that he immediately thought of recalling Bay View Packing's products when he received the letter, but that when he talked to the state agency, the agency was not "willing to be as forthcoming" as it was in the letter. Liebner also admitted that on April 15, he was informed that the FDA was requesting that Bay View Packing "begin recall operations." Liebner testified that he told the FDA that he was waiting for the USDA to "get back" to him, because the USDA had "main jurisdiction over a majority of the products involved," and that he wanted the two federal agencies "to get together so that [Bay View Packing] could recall all the products at one time." He admitted that although the USDA had not issued a recall notice on April 15, the FDA told him to begin working on recalling the fifteen percent of Bay View Packing's product line over which the FDA had jurisdiction. He testified that he again told the FDA that he "would like to see USDA and [the FDA] coordinate their effort together." Finally, Liebner testified that it was not until the USDA told Bay View Packing to recall its products on the afternoon of April 16, that he began to call his distributors to tell them to remove Bay View Packing's products. He also stated that he mailed a letter to all Bay View Packing customers on April 19, telling them of the recall.

With respect to the April 19, WISN TV newscasts, Liebner admitted that Bay View Packing continued to

process food using unheated Milwaukee water after the mayor's boil advisory on April 7, and that it did "limited" packing and processing from April 12 to April 16. He testified that Henry called him on April 19, asking if she could come down to Bay View Packing with her camera crew to do a story, and then asked, "Why [was Bay View Packing] still producing product during the crisis?" He testified that he told her she could not do the story. Later, after seeing a WISN TV "teaser" news brief about his company, he called Henry to dissuade her from running the story, because, in his words, she did not have her "facts straight." She asked him further questions and told him WISN TV was going to run the story.

Henry testified in her deposition that she was investigating follow-up stories for WISN TV's coverage of the *cryptosporidium* outbreak, when she was informed by the FDA that Bay View Packing was not complying with an "honor system" of recalling products produced with unheated Milwaukee water. She also testified that on April 19, the FDA official told her that Bay View Packing was "not acting in good faith." She further testified that she was informed that the City of Milwaukee Health Department was told by the FDA to remove Bay View Packing products from store shelves and that she then followed Vlasak in two stores, filming him and questioning him as he removed Bay View Packing products.

Henry also testified in her deposition that she called Liebner on April 19 to see if she could interview him, and she told him that the FDA had stated that Bay View Packing was not acting in "good faith." Henry testified that Liebner told her that Bay View Packing was "cooperating with the FDA . . . and that it was not an overnight process." Henry also testified that

Liebner declined her invitation to appear on camera. With respect to the April 19 newscasts, Henry testified that she wrote both the "lead-ins" to the stories and the stories themselves.

In their depositions, both Taff and Burns Wolfe concede that they could not remember WISN TV's newscasts concerning Bay View Packing. Both testified, however, that the reporter and producer prepare the original news copy for the WISN TV broadcasts and that the anchors occasionally make stylistic or editing changes if necessary. Neither Taff nor Burns Wolfe could recall if they made any changes to Henry's stories on Bay View Packing.

The trial court granted summary judgment dismissal in favor of the WISN TV defendants because it concluded that Bay View Packing and Liebner were limited purpose public figures for purposes of Wisconsin defamation law. Accordingly, the trial court concluded that in order for Bay View Packing's and Liebner's defamation claims to survive summary judgment, Bay View Packing needed to show in its summary judgment materials that the WISN TV defendants acted with actual malice in making the alleged defamatory statements. The trial court concluded that Bay View Packing did not meet this burden, and granted summary judgment dismissal for the WISN TV defendants.

With respect to the defamation claim against Vlasak, the trial court dismissed the complaint, concluding that the summary judgment materials established that Vlasak's statements were "substantially true," and therefore, Bay View Packing's defamation claim could not survive summary judgment. The trial court later awarded both the City and the WISN TV defendants costs for defending the

action. Bay View Packing and Liebner appeal from the summary judgment dismissals.

## II. ANALYSIS.

### A. *Standard of Review.*

■

"Summary judgment is appropriate to determine whether there are any disputed factual issues for trial and 'to avoid trials where there is nothing to try.' " *Caulfield v. Caulfield,* 183 Wis. 2d 83, 91, 515 N.W.2d 278, 282 (Ct. App. 1994) (citation omitted). Summary judgment may be particularly appropriate in defamation actions in order to mitigate the potential "chilling effect" on free speech and the press that might result from lengthy and expensive litigation. *See, e.g. Time, Inc. v. Hill,* 385 U.S. 374, 401-02 (1967) (Douglas, J., concurring).[4] While we apply the same methodology as the trial court when reviewing a summary judgment motion, we owe no deference to the conclusion of the trial court. *Kotecki & Radtke, S.C. v. Johnson,* 192 Wis. 2d 429, 436, 531 N.W.2d 606, 609 (Ct. App. 1995). Indeed, the United States Supreme Court has declared that in defamation cases "an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure 'that the judgment does not constitute a forbidden intrusion on the field of free expression.' " *Bose Corp. v. Consumers Union of the United States, Inc.,* 466 U.S. 485, 499 (1984). As such,

---

[4] "Summary judgment occupies a position of great importance in libel actions as compared with other civil actions, due to the possible chilling effect on constitutionally protected speech which would result from the defense of defamation claims." *Sunshine Sportswear & Elecs., Inc., v. WSOC Television, Inc.,* 738 F. Supp. 1499, 1505 (D. S.C. 1989).

we first examine the pleadings to determine whether they state a claim for relief. *See Kotecki & Radtke, S.C.,* 192 Wis. 2d at 437, 531 N.W.2d at 609. If the pleadings state a claim and the responsive pleadings join the issue, we then must examine the evidentiary record to analyze whether a genuine issue of material fact exists or whether the moving party is entitled to a judgment as a matter of law. *Id.* Further, "[o]n summary judgment, we must draw all justifiable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991). Applying the above standard of review, we next address the law of defamation in Wisconsin in order to determine whether the trial court properly granted summary judgment to the defendants.

## B. *Defamation Claims in Wisconsin.*

In Wisconsin, the elements of a common law defamation claim are:

"(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher; and

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication."

*Van Straten v. Milwaukee Journal Newspaper-Publisher,* 151 Wis. 2d 905, 912, 447 N.W.2d 105, 108 (Ct. App. 1989) (citation omitted), *cert. denied,* 496 U.S. 929

(1990). In *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964), the United States Supreme Court added a constitutional element to defamation actions that is dependent on the status of the plaintiff. The Court held that the First and Fourteenth Amendments to the United States Constitution require that in order for "public officials" to recover damages in a defamation action against media defendants, they must prove by clear and convincing evidence that the defamer made the defamatory statement with "actual malice"—that is, either with " 'knowledge that it was false or with reckless disregard of whether it was false or not.' " *Denny v. Mertz,* 106 Wis. 2d 636, 643, 318 N.W.2d 141, 144 (citation omitted), *cert. denied,* 459 U.S. 883 (1982).

■

The *New York Times Co. v. Sullivan* "constitutional privilege" was later extended to media defendants facing a defamation action by "public figure" plaintiffs, as well as "public official" plaintiffs.[5]

---

[5] We note that the United States Supreme Court has only required that the "constitutional privilege" be applied to media defendants facing defamation claims from public officials or public figures. It has not yet ruled on whether non-media defendants facing defamation claims from public figures have the same constitutional privilege. Further, this remains an open question under Wisconsin law because the Wisconsin Supreme Court has not definitively addressed this issue either. *See Denny v. Mertz,* 106 Wis. 2d 636, 660-61, 318 N.W.2d 141, 152-53 (determining that *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974), does not require that non-media defendants are entitled to the constitutional privilege), *cert. denied,* 459 U.S. 883 (1982); *Calero v. Del Chem. Corp.,* 68 Wis. 2d 487, 505-06, 228 N.W.2d 737, 747-48 (1975) (concluding that purely private defamations are not entitled to constitutional privileges); *cf. Polzin v. Helmbrecht,* 54 Wis. 2d 578, 586, 196 N.W.2d 685, 689 (1972) (holding *New York Times* privilege does apply to non-

*See Curtis Publishing Co. v. Butts,* 388 U.S. 130, 155 (1967). Generally, "public figures" are defined as "those persons who, although not government officials, are nonetheless 'intimately involved in the resolution of important public questions.' " *Wiegel v. Capital Times Co.,* 145 Wis. 2d 71, 81, 426 N.W.2d 43, 48 (Ct. App. 1988) (citation omitted).

> One may become a public figure in two ways. He or she may be a public figure for all purposes due to general fame or notoriety. More commonly, however, one assumes that status by involvement in a particular public issue or controversy and thereby becomes a public figure for a limited range of issues.

media defendant facing defamation claim from media plaintiff: "We think critics of the media, like appellant here, are entitled to the same protections as were provided for the media in the *New York Times . . .* case[ ]."). *But see Dalton v. Meister,* 52 Wis. 2d 173, 183, 188 N.W.2d 494, 499 (1971) ("The *Times-Sullivan* rule is not confined to news media and free press but also applies to private individuals and free speech *in some cases.*" (Emphasis added.)), *cert. denied,* 405 U.S. 934 (1972); *Harris v. Quadracci,* 48 F.3d 247, 253 & n.8 (7th Cir. 1995) (concluding that federal courts have "determined that Wisconsin law allows the application of the 'actual malice' standard to at least some non-media defendants."); *Underwager v. Salter,* 22 F.3d 730, 734-35 (7th. Cir.) (concluding plaintiffs had not persuaded federal court of appeals that Wisconsin courts made a distinction between media and non-media defendants in defamation actions), *cert. denied,* 115 S. Ct. 351 (1994).

In the case at bar, the WISN TV defendants are all media defendants, and thus, the constitutional privilege applies. While Vlasak is not a media defendant, we need not resolve the question of whether the constitutional privilege applies to him because we resolve the claim against him on other grounds. *See Gross v. Hoffman,* 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issue need be addressed).

*Id.* at 82, 426 N.W.2d at 48.

"To fit the first category, the person must be a 'well-known "celebrity," his [or her] name a "household word" '—a person whose words and deeds are followed by the public 'because it regards his [or her] ideas, conduct, or judgment as worthy of its attention.' " *Id.* (quoting *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1294 (D.C. Cir.), *cert. denied,* 449 U.S. 898 (1980)). In the present case, none of the parties contend that either Bay View Packing or Liebner was a general purpose public figure. Nonetheless, the plaintiffs may fit the second category; that is, although they are "not generally famous or notorious," they may become public figures for a "limited purpose" because of their involvement in a "particular public controversy." *Id.* at 82, 426 N.W.2d at 48-49.

Our supreme court has definitively stated that the question of whether a person is a "limited purpose public figure" is an issue left solely to the court to decide *as a matter of law*, not an issue of fact to be decided by the jury. *Lewis v. Coursolle Broadcasting of Wisconsin, Inc.,* 127 Wis. 2d 105, 110, 377 N.W.2d 166, 168 (1985). Indeed, because the status of the plaintiff controls whether he or she must prove "actual malice" in order to recover damages, or merely meet a lesser standard of proof to recover, the question of whether a plaintiff is a limited purpose public figure should be resolved first. *Id.* at 109, 377 N.W.2d at 168. Nonetheless, while the ultimate question of whether a plaintiff is a limited purpose public figure is a question of law, material factual disputes on this issue can arise. These factual disputes are not to be left to the jury at trial, but should be resolved by the trial court prior to trial, after an

676

evidentiary hearing solely on this issue, if necessary. *See, e.g., Harris v. Tomczak,* 94 F.R.D. 687, 693 (E.D. Cal. 1982) (analogizing procedure to that of probable cause determinations in criminal cases) (citation omitted).

If the trial court at summary judgment determines that the plaintiff is a limited purpose public figure, the dispositive factual dispute then becomes whether the plaintiff's summary judgment materials show "actual malice" on the part of the defendant. Hence, the trial court must determine "whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255-56 (1986). If the plaintiff does not meet this burden, the defamation claim should be dismissed as legally insufficient because it is quite clear that under no circumstances can the plaintiff recover. *See Barillari v. City of Milwaukee,* 194 Wis. 2d 247, 256, 533 N.W.2d 759, 762 (1995). If the plaintiff meets this burden, the remaining elements of the defamation claim are sufficiently pleaded, no other defenses or privileges raised to the defamation action dispose of the action as a matter of law, and genuine issues of material fact remain in dispute, the defamation action should proceed to trial.

### C. Limited Purpose Public Figure Test.

In *Denny v. Mertz,* 106 Wis. 2d 636, 318 N.W.2d 141, *cert. denied,* 459 U.S. 883 (1982), our supreme court established the following two-prong test to determine whether a defamation plaintiff is a limited

purpose public figure: (1) there must be a public contro-versy; and (2) the court must look at the nature of the plaintiff's involvement in the public controversy to see whether the plaintiff has injected himself or herself into the controversy so as to influence the resolution of the issues involved. *Id.* at 649-50, 318 N.W.2d at 147. In *Wiegel v. Capital Times Co.,* 145 Wis. 2d 71, 426 N.W.2d 43 (Ct. App. 1988), this court expanded on *Denny* and provided a three-step analysis to be used when considering the second prong of the *Denny* test.[6]

> The three steps include: (1) isolating the contro-versy at issue; (2) examining the plaintiff's role in the controversy to be sure that it is more than triv-ial or tangential; and (3) determining if the alleged defamation was germane to the plaintiff's participa-tion in the controversy.

*Van Straten,* 151 Wis. 2d at 913-14, 447 N.W.2d at 109 (citing *Wiegel,* 145 Wis. 2d at 82-83, 426 N.W.2d at 49). With these factors in mind, we address the question of whether Bay View Packing is a limited purpose public figure.

### D. Application of Denny v. Mertz Test.

### 1. Public controversy.

---

[6] While other jurisdictions have questioned whether the *Denny v. Mertz,* factors and the *Wiegel v. Capital Times Co.,* 145 Wis. 2d 71, 426 N.W.2d 43 (Ct. App. 1988), standards differ, *see Harris,* 48 F.3d at 251 n.6, we conclude that *Wiegel* essentially expands and provides more depth to the second of *Denny*'s two prongs. Hence, the two cases should not be viewed as inconsistent.

██

The first factor we examine is whether there is a "public controversy." *Denny,* 106 Wis. 2d at 649-50, 318 N.W.2d at 147. Dispositive of this factor is whether the dispute or controversy has "an impact outside of those immediately interested" in the dispute. *Id.* at 650, 318 N.W.2d at 148. Thus, the question is not whether the issue is only of " 'general or public interest,' " *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 346 (1974) (citation omitted), or is merely "newsworthy." *Waldbaum,* 627 F.2d at 1296. "[I]t must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Id.* Hence, "[i]f the issue was being debated publicly and if it had foreseeable and substantial ramifications for non-participants, it was a public controversy." *Id.* at 1297.

██

It is clear that there was a public controversy in this case. The *cryptosporidium* contamination of the City of Milwaukee's water supply had a substantial effect on the entire Milwaukee metropolitan area. According to the uncontroverted summary judgment materials, 400,000 people—nearly one-half of the city's population—were affected by *cryptosporidiosis.* Schools were closed, hospital emergency rooms and health clinics were inundated with patients, and the lives of those metropolitan residents with compromised immune systems were placed in jeopardy. Further, the secondary effects of the contamination, such as lost worker productivity, rippled throughout the State of Wisconsin and, to a lesser extent, the rest of the nation. Thus, there is no question that at the time of the alleged defamatory statements, the *cryptosporidium* contamination "was being debated publicly" and that

"it had foreseeable and substantial ramifications" for the entire Milwaukee community. *Id*.

## 2. Plaintiffs' role in controversy.

Under *Denny*, we must next look at the nature of the plaintiff's involvement in the public controversy. *Denny*, 106 Wis. 2d at 650, 318 N.W.2d at 147. As stated above, *Wiegel* provides an expanded three-step analysis for this court to use when addressing this factor.

### a. *Isolating the narrow public controversy at issue.*

The first step is to isolate the public controversy with respect to the alleged defamatory statements at issue. *Wiegel,* 145 Wis. 2d at 83, 426 N.W.2d at 49 (citation omitted). This is necessary because a public controversy, as defined in *Denny*, can be both "broad" and "narrow" in scope.

> A narrow controversy will have fewer participants overall and thus fewer who meet the required level of involvement. A broad controversy will have more participants, but few can have the necessary impact. Indeed, a narrow controversy may be a phase of another, broader one, and a person playing a major role in the "subcontroversy" may have little influence on the larger questions or on other sub-controversies. In such an instance, the plaintiff would be a public figure if the defamation pertains to the subcontroversy in which he is involved but would remain a private person for the overall controversy and its other phases.

*Waldbaum,* 627 F.2d at 1297 n.27.

The isolated controversy in this case is a narrowly drawn "subcontroversy" of the broadly framed issue of the *cryptosporidium* contamination of the city's water supply. The subcontroversy is the alleged production and distribution of foodstuffs using untreated or unboiled Milwaukee water after governmental agencies first advised and then demanded that potentially contaminated products be recalled. Clearly, this is a dispute that had "an impact outside those immediately interested," that is, beyond Bay View Packing, Liebner, and the WISN TV defendants. *Denny,* 106 Wis. 2d at 650, 318 N.W.2d at 148.

It is undisputed that prior to the WISN TV broadcasts, both the state and federal governments were concerned about Milwaukee food producers, including Bay View Packing, which used untreated or unboiled Milwaukee water. Indeed, both governments issued either food advisories or recall orders to Bay View Packing before the WISN TV newscasts. Underlying these advisories and recalls was a public concern for the potential distribution of food produced or processed with contaminated water. Further, it is undisputed that these governmental concerns had been the focus of news reports the week prior to the specific WISN TV story on Bay View Packing. Thus, it is clear that the underlying subcontroversy was being "debated publicly" prior to the April 19 newscasts, albeit not with specific reference to Bay View Packing. *Waldbaum,* 627 F.2d at 1296. Keeping this subcontroversy in mind, we next apply the second of the *Wiegel* steps, that is, we examine Bay View Packing's "role in the controversy to be sure that it is more than trivial or tangential." *Van Straten,* 151 Wis. 2d at 913-14, 447 N.W.2d at 109 (citing *Wiegel,* 145 Wis. 2d at 82-83, 426 N.W.2d at 49).

### b. *Are the plaintiffs' roles in controversy more than trivial or tangential?*

This issue lies at the heart of this appeal. At oral argument on this case, Bay View Packing and Liebner's counsel contended that the WISN TV defendants "created" a controversy "where none existed," and that the plaintiffs' "only public involvement was the television reports." Therefore, Bay View Packing and Liebner argue, the WISN TV defendants "cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire,* 443 U.S. 111, 135 (1979). We fundamentally disagree with Bay View Packing and Liebner's characterization of their role in the public controversy.

Generally, to be considered a limited purpose public figure, a person must have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz,* 418 U.S. at 345. "This one factor, however, is not the be-all and end-all of public figure status. Injection is not the only means by which public-figure status is achieved." *Dameron v. Washington Magazine, Inc.,* 779 F.2d 736, 740-41 (D.C. Cir. 1985), *cert. denied,* 476 U.S. 1141 (1986). Indeed, as the Supreme Court recognized in *Gertz,* "it may be possible for someone to become a public figure through no purposeful action of his own." *Gertz,* 418 U.S. at 345. "Persons can become involved in public controversies and affairs without their consent or will," *Dameron,* 779 F.2d at 741, through " 'sheer bad luck,' " *Wiegel,* 145 Wis. 2d at 86, 426 N.W.2d at 50 (citation omitted), or "if [their] activities 'almost inevitably put [them] into the vortex of a public controversy.' " *Id.* at 85, 426 N.W.2d at 50 (citation

omitted). Such involuntary persons can thus become public figures "for the limited purpose of discussions of" the public controversy they have been drawn into; *Dameron,* 779 F.2d at 741; however, "the instances of truly involuntary public figures must be exceedingly rare." *Gertz,* 418 U.S. at 345.

Bay View Packing and Liebner intimate that they had no desire for publicity in the *cryptosporidium* controversy and that they did not "thrust" themselves into the controversy. Our focus, however, is on their role in the public controversy "rather than on any desire for publicity or other voluntary act" on their part. *Wiegel,* 145 Wis. 2d at 85, 426 N.W.2d at 50. Indeed, in some cases it is sufficient that a plaintiff " 'voluntarily engaged in a course that was bound to invite attention and comment.' " *Id.* (citation omitted).

The summary judgment materials do establish that, at best, Bay View Packing and Liebner were "reluctant" participants in the public controversy. *See id.* Neither Bay View Packing nor Liebner announced to the world that the company was continuing to process and pack food on a "limited" basis after the government advisories were issued. Nor did either announce that Bay View Packing was waiting for the USDA to order a recall before it told its distributors to remove the products from the store shelves. Our analysis does not end with this evidence, however, because "[p]ersons can become involved in public controversies . . . without their consent or will." *Dameron,* 779 F.2d at 741.

■■■

The record also establishes that through the "sheer bad luck,'" *see Wiegel,* 145 Wis. 2d at 86, 426 N.W.2d at 50 (citation omitted), of the *cryptosporidium* contamination, Bay View Packing's and Liebner's

action, or more properly stated, voluntary inaction, in not immediately complying with the state's advisory recommendation and the federal government's recall notice "inevitably put [them] into the vortex of a public controversy." *Id.* at 85, 426 N.W.2d at 50 (citation omitted). Liebner's deposition confirms that he had received the state food advisory with the voluntary recall notice on April 13. He further admitted that although the FDA told him on April 15 to recall the fifteen percent of his product line under FDA jurisdiction, he waited for the USDA to issue its recall notice on April 16 before he called any of his distributors to tell them to remove all of Bay View Packing's products from the store shelves. In addition, he admitted that Bay View Packing continued to process and pack food on a limited basis after the April 13 advisory was issued. These actions, or inactions, in the face of the underlying public concern for preventing contaminated food from reaching the consumer, made both Bay View Packing's and Liebner's roles in the controversy more than trivial or tangential. *Van Straten,* 151 Wis. 2d at 913-14, 447 N.W.2d at 109.

### c. Are defamatory statements germane to participation in controversy?

Lastly, we address the third of the *Wiegel* steps by examining whether "the alleged defamation was germane to the plaintiff's participation in the controversy." *Van Straten,* 151 Wis. 2d at 914, 447 N.W.2d at 109 (citation omitted). All of the alleged defamatory statements made by WISN TV were reported "in connection with and to emphasize" the potential public health concerns of *cryptosporidium*-contaminated food reaching the public. *See id.* at 916,

684

447 N.W.2d at 110. As such, the alleged defamatory newscasts were fully germane to Bay View Packing and Liebner's actions and inactions with respect to the governmental advisories and recall notices.

### 3. Involuntary limited purpose public figure status.

Simply put, the summary judgment materials establish, as a matter of law, that Bay View Packing and Liebner fit the "exceedingly rare" status of being an involuntary limited purpose public figure. *Gertz,* 418 U.S. at 345. This status was solely with respect to the narrow public controversy surrounding the potential distribution of contaminated food products. Therefore, because we conclude the plaintiffs were involuntary limited purpose public figures, in order for their complaint to survive summary judgment, we must determine "whether the evidence in the record could support a reasonable jury finding . . . that the plaintiff[s have] shown actual malice by clear and convincing evidence." *See Anderson,* 477 U.S. at 255-56. We agree with the trial court that the plaintiffs failed to meet this burden.

### E. *Actual Malice Standard.*

Whether the undisputed facts at summary judgment "fulfill the legal standard of actual malice is a question of law." *Van Straten,* 151 Wis. 2d at 917, 447 N.W.2d at 110. The United States Supreme Court defined "actual malice" as knowledge that the statement was false or reckless disregard as to whether it was false. *New York Times,* 376 U.S. at 279-80. "The

685

focus is upon the defendant's attitude pertaining to the truth or falsity of the published statements rather than upon any hatefulness or ill-will." *Van Straten,* 151 Wis. 2d at 917, 447 N.W.2d at 110. Indeed, to survive summary judgment "[t]he plaintiff must show 'that the defendant in fact entertained serious doubts as to the truth of [the] publication.' " *Id.* (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968)).

Bay View Packing and Liebner attempt to establish "actual malice" by pointing to the fact that Liebner called Henry shortly before the 6:00 p.m. WISN TV newscast and told her that she did not have her "facts straight," and that Bay View Packing was recalling its products. This assertion does not show by clear and convincing evidence that Henry either had "actual knowledge" that the report was false, or that she "entertained serious doubts" as to the truth of her reports. Further, "mere proof of failure to investigate the accuracy of a statement, without more, cannot establish reckless disregard for the truth." *Van Straten,* 151 Wis. 2d at 918, 447 N.W.2d at 111. Indeed, it is undisputed that Henry asked Liebner to appear on camera to give Bay View Packing's "side of the story." Liebner declined, but Henry still reported that according to Liebner, Bay View Packing was "cooperating with the FDA and USDA" and that "no product made after the boil advisory ever hit the shelves." In addition, the plaintiffs make no showing that either Taff or Burns Wolfe had knowledge that Henry's story was false or that they "entertained serious doubts" as to the truth of the newscasts.

In short, the summary judgment materials do not establish "actual malice" on the part of any of the WISN TV defendants. As such, the trial court properly

granted their motion for summary judgment dismissal because it is clear that the plaintiffs cannot recover under any circumstance. *Barillari,* 194 Wis. 2d at 256, 533 N.W.2d at 762.

### F. Defamation Claim Against Vlasak.

The only remaining issue we must review is whether the trial court properly granted summary judgment dismissal to Vlasak. Vlasak made the following statements in the WISN TV newscasts: (1) "It's either Bay View or Lake Side. That's pickled eggs, pickled pigs feet or cooked turkey gizzards;" and (2) "Bay View they've got the USDA and FDA to contend with." The trial court concluded that the uncontroverted summary judgment materials establish that Vlasak's statements were substantially true. We agree with the trial court.

In a defamation action, the defendant must make a false statement concerning another. *Van Straten,* 151 Wis. 2d at 912, 447 N.W.2d at 108 (citation omitted). Therefore, "substantial truth" is the ultimate defense to a defamation action. *See Prahl v. Brosamle,* 98 Wis. 2d 130, 141, 295 N.W.2d 768, 776 (Ct. App. 1980). In his deposition, Liebner admitted that both of Vlasak's statements were true. Accordingly, the trial court properly granted summary judgment dismissal to Vlasak because he could not recover under any circumstance. *Barillari,* 194 Wis. 2d at 256, 533 N.W.2d at 762.

### III. CONCLUSION.

We conclude that the summary judgment materials establish, as a matter of law, that Bay View Packing and Liebner were involuntary limited purpose public

figures with respect to the alleged defamatory statements made by the WISN TV defendants. Further, the summary judgment materials do not establish that the WISN TV defendants made the alleged defamatory statements with actual malice; thus, the trial court properly granted summary judgment dismissal on their behalf. Finally, we conclude that the summary judgment materials establish that Vlasak's alleged defamatory statements were substantially true and that the trial court properly granted summary judgment dismissal on his behalf.

*By the Court.*—Judgments affirmed.