COURT OF APPEALS
DECISION
DATED AND FILED

September 17, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP998**

STATE OF WISCONSIN

Cir. Ct. No. 2021CV625

IN COURT OF APPEALS
DISTRICT III

CORY TOMCZYK AND GENESIS VENTURES, INC. (D/B/A IROW),

    PLAINTIFFS-APPELLANTS,

  V.

WAUSAU PILOT AND REVIEW CORPORATION, DAMAKANT JAYSHI AND SHEREEN SIEWERT,

    DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Marathon County: SCOTT M. CORBETT, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

¶1      STARK, P.J. Cory Tomczyk and Genesis Ventures, Inc. d/b/a IROW[1] appeal from an order of the circuit court granting summary judgment to Wausau Pilot and Review Corporation, Damakant Jayshi, and Shereen Siewert[2] and dismissing Tomczyk and IROW's defamation lawsuit.  Tomczyk and IROW allege that Wausau Pilot published two articles in August 2021 falsely accusing Tomczyk of referring to two individuals as a "fag"[3] at a Marathon County Board of Supervisors meeting, during which the county board addressed whether it should adopt a resolution aimed at increasing diversity by labeling the county a "community for all" (hereinafter, Community for All resolution).

¶2      The issue on appeal is whether Tomczyk is a public figure for purposes of defamation law.  If so, Tomczyk and IROW are required to establish that Wausau Pilot made the allegedly defamatory statements with actual malice—the standard established under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).  The circuit court determined that Tomczyk was a limited purpose public figure with respect to the Community for All debate and that Tomczyk and IROW were unable to prove, by clear and convincing evidence, that Wausau Pilot made

---

[1] Tomczyk owns IROW, a shredding, recycling, and media destruction company servicing Clark, Oneida, Vilas, and Marathon counties.

[2] Wausau Pilot and Review Corporation is a nonprofit online newspaper covering the local Marathon County area.  Shereen Siewert is the founder and publisher of the online newspaper, and Damakant Jayshi is one of the newspaper's writers.  For ease of reading, we will refer to the newspaper, Siewert, and Jayshi collectively as "Wausau Pilot."

[3] This slur is a "term of abuse and disparagement" used to offensively refer to "a gay person."                    *Fag*,                    MERRIAM-WEBSTER                    DICTIONARY, https://www.merriam-webster.com/dictionary/fag (last viewed Sept. 5, 2024).  As Tomczyk and IROW admit, that word "is one of the most explosive words in the English language, with a long history of being used as a vile epithet."  Accordingly, we refuse to repeat the term more than necessary, and we will instead refer to it throughout this decision as "the slur."

the allegedly defamatory statements with actual malice.  For the reasons that follow, we affirm the circuit court's decision.

## BACKGROUND

¶3      The debate in Marathon County surrounding the Community for All resolution occurred prior to and during the summer of 2021.  While Tomczyk is a current Wisconsin State Senator representing the 29th Senate district, at the time of the resolution's debate, he was not yet a senator, but he was an active community leader.  According to Tomczyk, he learned about the Community for All resolution sometime in 2020 or 2021 in an email he received from the Republican Party.  He opposed the resolution on the grounds that "it left the door open for too many things to go in directions that I personally wouldn't support" and that "it set up the opportunity for some liberal people to enforce their viewpoints and their values on other people within the community."

¶4      As a result, Tomczyk attended protests against the Community for All resolution, and he spoke in opposition to the resolution at two public county board meetings.  Those meetings occurred on May 13, 2021, and August 12, 2021. After the May 13 meeting, The New York Times published an article reporting on that meeting with a photo of Tomczyk appearing in the online version of the article.  The August 12 meeting was held by the executive committee of the county board, and Tomczyk once again attended and spoke out against the resolution as well as the board itself.

¶5      It was at that August 12, 2021 public meeting that Tomczyk is alleged to have used the slur to refer to two other speakers.  According to an affidavit and the deposition testimony of Norah Brown—who supported the Community for All resolution and whose thirteen-year-old son spoke at the

meeting—she and her son were seated in the front row of the gallery during the meeting, and a man and a woman were seated directly behind her. Brown stated that she did not know who these individuals were, but she later learned they were Tomczyk and Meg Ellefson, the host of a local radio show. Brown attested that at one point during the meeting, "Tomczyk turned to Ms. Ellefson and, referencing [an individual who was getting up to speak], Mr. Tomczyk whispered, 'There's [slur] #1.'" Brown's testimony was that she did not know the individual who was getting up to speak, but she "believe[d] that [Tomczyk] was referencing that person because they appeared to be transgender."

¶6 According to Brown, after hearing Tomczyk's comment, she immediately "turned and made eye contact with" Tomczyk. Brown claimed that she "reacted visibly when [Tomczyk] made the … comment because hearing that word shocked [her]." She asserted that "Tomczyk [then] looked at my son and referred to him as 'the second [slur]'" to Ellefson. Brown believed Tomczyk was referring to her son with the second slur because Tomczyk "gave a nod of his head … as if he was pointing in front of him," Brown and her son "were the only two people sitting directly in front of him at that point, and he made eye contact with [Brown] after [her] reaction to the first comment."

¶7 Brown then sent a message to Christine Salm—another community member who was also in the meeting but was seated on the other side of the room—via Facebook messenger. The message said: "The man behind me just referred to the speaker and then to my son as a [slur]. I am in tears and livid. [My son] thankfully did not hear it (I think)." Salm responded, "I'm so sorry. His name is Corey [sic] Tomczyk[;] he owns IROW." According to Brown, her son confirmed after the meeting that he also heard Tomczyk use the slur.

¶8    A video of the August 12, 2021 meeting was made publicly available on the internet.  *Marathon County Executive Committee Meeting*, YOUTUBE (Aug. 12, 2021), https://www.youtube.com/watch?v=S9wm6h3aOJE (last viewed Sept. 10, 2024).   While Tomczyk's comments cannot be heard, Brown can be seen turning her head to look at Tomczyk as an individual was walking up to the microphone to speak, which occurred approximately twelve minutes into the video.  The clock on the wall is visible in the video, showing that the time was approximately 4:14 p.m.  A couple of minutes later, the camera switches back to a view of the audience, and Brown can be seen on the video looking down at her telephone in her lap.  The record indicates that Brown sent Salm the message at 4:16 p.m.

¶9    One week later, on August 19, 2021, the county board held another public meeting.  The day before that meeting, Brown emailed Wausau Pilot to "encourage[] coverage of this meeting because of the importance of the resolution and in light of the nature of last week's executive committee meeting which covered the same topic."   Brown continued, "I expected opposition to the resolution, but did not expect the hatred and vulgarity that [she and her son] heard both in public comment and in the audience.  An individual sitting behind us even referred to one of the other speakers and to my son using a slur (f**)."

¶10   Then, during the August 19, 2021 meeting, two community members publicly addressed Tomczyk's alleged use of the slur at the August 12, 2021 meeting.  *Marathon County Board Educational Meeting*, YOUTUBE (Aug. 19, 2021), https://www.youtube.com/watch?v=5wZEQIEvFz0 (last viewed Sept. 10, 2024).  Brown spoke, expressing that she and her son had "heard some despicable comments from a couple people sitting near us, notably referring to another speaker as well as to my son, a 13 year old, with an extremely offensive

slur." Another community member, Lisa Ort Sondergard, stated: "One adult, a local businessman, called a young teenager a [slur]. He may have thought only the person he said it to heard his ugly attack. But that is not true. Several people around him heard this slur including the teen it was directed at and his mother." (Formatting altered.)

¶11 On August 21, 2021, Wausau Pilot published the first article at issue in this case, reporting on the Community for All debate (hereinafter, the August 21 article). Jayshi's name was on the byline. The article outlined the opinions on each side of the debate and quoted several individuals. The article also reported on the August 19, 2021 meeting and addressed Tomczyk's alleged comment. The August 21 article stated:

> Norah Brown, who also spoke at the meeting said her son, 13, and another speaker faced a slur at the Executive Committee meeting last week. Lisa Ort Sondergard who is a member of the county's Diversity Affairs Commission, witnessed the episode and said she heard a local businessman using the slur ….

Of note, the August 21 article did not identify Tomczyk by name, only referring to him as "a local businessman."

¶12 On August 28, 2021, one week later, Wausau Pilot published the second article at issue in this case, which identified Tomczyk as the individual who had used the slur at the August 12, 2021 meeting (hereinafter, the August 28 article). The August 28 article also included a hyperlink to the August 21 article. Again, Jayshi was listed as the author of the article. The August 28 article observed that the Community for All debate "exposed rifts not only between elected officials but also among members of the community, mirroring a divide that, polls show, is only getting wider." It further reported that certain county

6

board supervisors and members of the county's diversity commission had been harassed and threatened as a result of the resolution. The August 28 article continued:

> Mosinee resident Cory Tomczyk, during an Executive Committee meeting on Aug. 12, called commission members "fools" who are paid by taxpayers. Tomczyk, earlier this month, was widely overheard calling a 13-year-old boy who spoke in favor of the resolution a [slur], prompting another resident, Christopher Wood, to say later that the boy should "get over it."

According to the record, while Jayshi wrote the article, the sentence attributing the slur to Tomczyk was added by Siewert after she took steps to confirm that Tomczyk had used the slur at the August 12 meeting.

¶13    Tomczyk and IROW sent a notice of defamation and demand for retraction letter to Siewert and Wausau Pilot. The letter demanded that Wausau Pilot "either provide supporting documentation or witness statements substantiating the quote you have attributed to Mr. Tomczyk, or you must retract the quote attributed to him in that article."

¶14    When Wausau Pilot refused to issue a retraction, Tomczyk and IROW filed this suit against Wausau Pilot, alleging defamation claims on behalf of both Tomczyk and IROW.[4] The basis of the defamation claims was that Wausau Pilot "disparaged not only Tomczyk, but his business, IROW"—given the identification of "Tomczyk as a 'local businessman'"—by "asserting that Tomczyk referred to a 13-year-old boy as a '[slur],'" which the complaint stated "stemmed from ill will, bad intent, and malevolence towards" Tomczyk. The

---

[4] The original complaint listed Wausau Pilot and Jayshi as defendants. A later-filed amended complaint added Siewert as a defendant.

complaint further alleged that Wausau Pilot acted "with actual malice" because it "either knew such statements were false, or … acted with reckless disregard as to whether such statements were true or false." In addition, the complaint alleged that Wausau Pilot acted "with an intent to harm [Tomczyk's] reputation in the community."

¶15 Wausau Pilot moved for summary judgment. It argued that Tomczyk was both a general purpose and a limited purpose public figure at the time the articles were published. Therefore, Wausau Pilot asserted that the actual malice standard applied to the defamation claims, which it alleged Tomczyk and IROW were unable to establish by clear and convincing evidence. Further, based on the evidence in the record, Wausau Pilot asserted that its reporting was substantially true and that Tomczyk was unable to prove that the comments were falsely attributed to him.[5] Finally, Wausau Pilot claimed that its August 28 article was privileged as a "true and fair report" of a government proceeding pursuant to WIS. STAT. § 895.05(1) (2021-22).[6]

¶16 The circuit court granted Wausau Pilot's summary judgment motion by written decision. The court concluded that Tomczyk was "a public figure at least for the limited purpose of the 'Community for All' debate" because "[h]e was a local business owner who spoke out against the resolution at two public meetings on the issue"; "[b]oth his public comments and the alleged use of a slur

---

[5] In the course of this litigation, three other witnesses who attended the August 12, 2021 meeting—in addition to Brown and her son—averred that they overheard Tomczyk use the slur: Megan Marohl, Carrie Marohl, and Alex Heaton. Going forward, as Megan and Carrie share a surname, we will refer to them by their first names.

[6] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

toward another person making public comment were newsworthy, making his role in the controversy more than trivial or tangential"; "[a]nd, given that the stated purpose of the 'Community for All' resolution was to promote inclusivity, his alleged use of the slur would be germane to the resolution and to his participation in the controversy." The court further determined that Tomczyk and IROW could not meet their burden to establish actual malice: "On this record, it is not possible to find that [Wausau Pilot] had serious doubts about the truth of the publication." Accordingly, the court dismissed Tomczyk and IROW's defamation claims without reaching Wausau Pilot's remaining arguments. Tomczyk and IROW appeal.[7]

---

[7] Wausau Pilot argues on appeal that Tomczyk "raise[s] no argument specific to IROW, nor did [he] in the [c]ircuit [c]ourt, and [he] do[es] not contest the application of the actual malice standard to IROW." As a result, Wausau Pilot claims that "[a]ny argument as to IROW is forfeited." Tomczyk responds that "[c]ontrary to [d]efendants' assertion, IROW remains an appellant to this appeal." Given that we affirm the circuit court's decision, we need not reach the issue of whether the arguments as to IROW have been forfeited. For the remainder of this decision, we will refer to Tomczyk and IROW collectively as "Tomczyk."

We also note that throughout its response brief, Wausau Pilot cites to newspaper articles in support of asserted facts on appeal. It does not appear that the record contains those articles, but the articles were included in Wausau Pilot's appendix. An appendix is not the record. *United Rentals, Inc. v. City of Madison*, 2007 WI App 131, ¶1 n.2, 302 Wis. 2d 245, 733 N.W.2d 322. Further, a party may not use its brief's appendix to supplement the record. *See Reznichek v. Grall*, 150 Wis. 2d 752, 754 n.1, 442 N.W.2d 545 (Ct. App. 1989). "We are limited to matters in the record," and we "will not consider any materials in an appendix that are not in the record." *Roy v. St. Lukes Med. Ctr.*, 2007 WI App 218, ¶10 n.1, 305 Wis. 2d 658, 741 N.W.2d 256.

Wausau Pilot cites *State v. Grahn*, 21 Wis. 2d 49, 53, 123 N.W.2d 510 (1963), for the proposition that we may take judicial notice of the newspaper articles. As Tomczyk recognizes, however, *Grahn* held that a court could take judicial notice of a newspaper article to establish the date of an event of national importance, but it reiterated that the general rule is that newspaper articles, when introduced to prove the truth of a statement therein, are inadmissible as hearsay. *Id.* Accordingly, Tomczyk objects to this court taking judicial notice of the newspaper articles. In this case, we would reach the same conclusion whether we relied on the newspaper articles included in Wausau Pilot's appendix or not. Thus, we need not reach the issue of whether we may take judicial notice of the articles.

**DISCUSSION**

¶17    The United States Supreme Court has interpreted the First Amendment as embracing "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," *New York Times*, 376 U.S. at 270, and "public figures," *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154-55 (1967). "Thus, an action for defamation can be maintained only to the extent it does not interfere with First Amendment rights of free expression." *Planet Aid, Inc. v. Reveal*, 44 F.4th 918, 924 (9th Cir. 2022). "The constitutional privilege in defamation actions varies with the law's interest in protecting a plaintiff's reputation." *Wiegel v. Capital Times Co.*, 145 Wis. 2d 71, 81, 426 N.W.2d 43 (Ct. App. 1988). "That interest is strongest where the plaintiff is a purely private individual not involved in any matter of public interest or controversy," and "[i]t is weakest when the plaintiff is a government official or a public figure." *Id.*

¶18    Generally, a plaintiff alleging a claim for defamation under Wisconsin common law must establish three elements:

> (1) a false statement; (2) communicated by speech, conduct or in writing to a person other than the person defamed; and, (3) the communication is unprivileged and tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her.

*Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 534 & n.9, 563 N.W.2d 472 (1997) (citation omitted); *see also Storms v. Action Wis. Inc.*, 2008 WI 56, ¶37 n.8, 309 Wis. 2d 704, 750 N.W.2d 739 (noting that some court of appeals' decisions had listed four elements for a defamation claim but that "[a]s this court

noted in ***Torgerson*** …, if the two sets of elements are at all different, such distinctions are not important in the present case").

¶19 The Supreme Court, in ***New York Times***, "added a constitutional element to defamation actions that is dependent on the status of the plaintiff," meaning "that in order for 'public officials' [and public figures] to recover damages in a defamation action against media defendants, they must prove by clear and convincing evidence that the defamer made the defamatory statement with 'actual malice.'" ***Bay View Packing Co. v. Taff***, 198 Wis. 2d 653, 675, 543 N.W.2d 522 (Ct. App. 1995). In this context, actual malice means that the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." ***New York Times***, 376 U.S. at 280.

¶20 In this case, the circuit court dismissed Tomczyk's defamation suit on summary judgment. "Summary judgment is appropriate to determine whether there are any disputed factual issues for trial and 'to avoid trials where there is nothing to try.'" ***Bay View Packing***, 198 Wis. 2d at 673 (citation omitted). In fact, "[s]ummary judgment may be particularly appropriate in defamation actions in order to mitigate the potential 'chilling effect' on free speech and the press that might result from lengthy and expensive litigation." ***Id.*** (citation omitted); *see also* ***Torgerson***, 210 Wis. 2d at 538 ("[I]n public figure defamation cases, 'because of the importance of free speech, summary judgment *is* the rule, and not the exception.'" (citation omitted)).

¶21 Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT.

§ 802.08(2). Applying this methodology, we independently review whether the circuit court properly granted summary judgment. ***Bay View Packing***, 198 Wis. 2d at 673. "Indeed, the United States Supreme Court has declared that in defamation cases 'an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.'" ***Id.*** (citation omitted). Thus, we must first examine whether Tomczyk was a public figure.

## I. Tomczyk's status

¶22 Courts define "public figures" as those individuals "who, although not government officials, are nonetheless 'intimately involved in the resolution of important public questions.'" ***Wiegel***, 145 Wis. 2d at 81 (citation omitted). "The rule is well settled: determination of the status of a plaintiff in a defamation action is a question for the court to decide as a matter of law," ***Lewis v. Coursolle Broad.***, 127 Wis. 2d 105, 110, 377 N.W.2d 166 (1985); ***Biskupic v. Cicero***, 2008 WI App 117, ¶14, 313 Wis. 2d 225, 756 N.W.2d 649, and should be resolved first, ***Bay View Packing***, 198 Wis. 2d at 677.

¶23 In Wisconsin, there are two kinds of public figures under the law: general purpose public figures and limited purpose public figures.[8] ***Wiegel***,

---

[8] Wausau Pilot argued before the circuit court and argues on appeal that Tomczyk is a general purpose public figure based on Tomczyk's prominence in the local community, which encompassed Wausau Pilot's coverage area. "A person is a public figure for all purposes when he or she has 'general fame or notoriety' in the location the defamation takes place." ***Biskupic v. Cicero***, 2008 WI App 117, ¶16, 313 Wis. 2d 225, 756 N.W.2d 649 (citation omitted); *see also* ***Lewis v. Coursolle Broad.***, 127 Wis. 2d 105, 117-18, 377 N.W.2d 166 (1985). "The guiding principle of this inquiry is that a public figure for all purposes has become involved in public affairs to an extent that he or she can be deemed to have accepted the same level of scrutiny as a public official." ***Biskupic***, 313 Wis. 2d 225, ¶16.

(continued)

145 Wis. 2d at 82.  We conclude that we need not reach the question of whether Tomczyk is a general purpose public figure because Tomczyk undoubtedly qualifies as a limited purpose public figure.  *See* ***Patrick Fur Farm, Inc. v. United Vaccines, Inc.***, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 (stating that "we decide cases on the narrowest possible grounds").

¶24    "Limited purpose public figures … are otherwise private individuals who have a role in a specific public controversy." ***Biskupic***, 313 Wis. 2d 225, ¶17.  In Wisconsin, our state supreme court "has established a two-prong test to determine whether a defamation plaintiff is a limited purpose public figure: '(1) there must be a public controversy; and (2) the court must look at the nature of the plaintiff's involvement in the public controversy.'" ***Sidoff v. Merry***, 2023 WI App 49, ¶17, 409 Wis. 2d 186, 996 N.W.2d 88 (citation omitted).  This test was expanded in ***Wiegel*** to include a three-step analysis to consider the second prong above. ***Sidoff***, 409 Wis. 2d 186, ¶17.  The three-step analysis includes: "(1) isolat[ing] the controversy at issue; (2) examin[ing] the plaintiff's role in the controversy to determine whether it is more than trivial or tangential; and (3) determin[ing] whether the alleged defamation was germane to the plaintiff's participation in the controversy." ***Id.***  "Under this approach, a person may become a limited purpose public figure either by 'voluntary injection' into a controversy or by being '*drawn into* a particular public controversy.'" ***Id.***, ¶18 (citation omitted).  "In order to address both aspects of the issue, the three-step

---

Tomczyk disagrees, citing ***Waldbaum v. Fairchild Publications, Inc.***, 627 F.2d 1287, 1292, 1296 (1980), for the propositions that the general purpose public figure test is a "strict one," that a public figure for all purposes is a "rare creature," and that "[f]ew people … attain the general notoriety that would make them public figures for all purposes."

analysis presents an objective test that assesses the facts about the plaintiff's relationship to the controversy." ***Id.***

### a. A public controversy

¶25    The first prong of the limited purpose public figure test asks whether there was a public controversy. ***Id.***, ¶17. "Dispositive of this factor is whether the dispute or controversy has 'an impact outside of those immediately interested' in the dispute. The controversy at issue must be one that 'was being debated publicly' and that 'affects the general public or some segment of it in an appreciable way.'" ***Id.***, ¶26 (citations omitted).

¶26    In this case, Tomczyk concedes that there was a public controversy. In his reply brief, Tomczyk states, "To be sure, the Community for All [r]esolution was a public controversy in Marathon County in the summer of 2021." We agree with the parties and the circuit court that the debate surrounding the Community for All resolution was a public controversy as that term is described in the case law.

### b. Nature of Tomczyk's involvement in the public controversy

¶27    The next prong of the limited purpose public figure test requires that we consider the nature of Tomczyk's involvement in the public controversy. *See* ***id.***, ¶17. The first step in that analysis instructs that we isolate the public controversy with respect to the allegedly defamatory statements, which could demonstrate whether the controversy is "narrow" or "broad" in scope. *See* ***Bay View Packing***, 198 Wis. 2d at 681. Here, the controversy centers around the Community for All resolution and what role Tomczyk played in that debate. Tomczyk does not argue to the contrary.

14

¶28    The second step in the analysis is to determine whether Tomczyk's role in the controversy was more than "trivial or tangential."  *See Wiegel*, 145 Wis. 2d at 83 (citation omitted).  The circuit court answered that question in the affirmative on summary judgment.  The court based its conclusion on the fact that Tomczyk "was a local business owner who spoke out against the resolution at two public meetings on the issue" and that "[b]oth his public comments and the alleged use of a slur toward another person making public comment were newsworthy."

¶29    "Generally, to be considered a limited purpose public figure, a person must have 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'"  *Bay View Packing*, 198 Wis. 2d at 683 (citation omitted).  This factor, however, "is not the only means by which public-figure status is achieved."  *Id.* (citation omitted).  The Supreme Court explained in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974), that "it may be possible for someone to become a public figure through no purposeful action of his [or her] own."  "Persons can become involved in public controversies and affairs without their consent or will," "through 'sheer bad luck,'" or "if [their] activities 'almost inevitably put [them] into the vortex of a public controversy.'"  *Bay View Packing*, 198 Wis. 2d at 683-64 (alterations in original; citations omitted).

¶30    We conclude that Tomczyk's involvement with the Community for All debate was more than trivial or tangential.  At the May 13, 2021 meeting, Tomczyk's opposition speech did not merely identify concerns with the provisions of the Community for All resolution, but his rebuke was also directed at members of the county board for what he claimed was a "failure of leadership."  *Marathon County Executive Committee Meeting*, YOUTUBE (May 13, 2021), https://www.youtube.com/watch?v=F5Sg2UhUgnU (last viewed Sept. 10, 2024).

Tomczyk further asserted that the Community for All resolution's stated effort to make the county "an open, inclusive, and diverse place to live and work" was implausible, questioning how the county board would accomplish this task because "you are not that important." *Id.* He concluded by proclaiming, "If I sound annoyed, you are correct. I expect better from our local government." *Id.* As noted above, after that meeting, The New York Times published an article reporting on the meeting, and an exhibit from Megan's deposition and a screen shot included in Wausau Pilot's summary judgment motion show that Tomczyk's photo appeared under the headline of the online article.

¶31 Tomczyk also spoke out against the resolution at the August 12, 2021 meeting. *Marathon County Executive Committee Meeting*, YOUTUBE (Aug. 12, 2021), https://www.youtube.com/watch?v=S9wm6h3aOJE (last viewed Sept. 10, 2024). Again, his remarks were aimed primarily at the county board members, claiming that the board was "continuing to allow a charade to persist" and referring to members of the county diversity commission as "fools." *Id.*

¶32 Importantly, Tomczyk's involvement in the Community for All debate followed closely his involvement in organizing and promoting numerous community protests against COVID-19 pandemic measures and vaccinations.[9] At

---

[9] We pause here to note that Tomczyk cites *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541 (4th Cir. 1994), for the proposition that "whether a plaintiff is a public figure is determined 'at the time of the alleged defamation.'" *See id.* at 1553. Accordingly, he concludes that "neither Tomczyk's past community service, nor his current position as a [s]tate [s]enator, has any bearing on the 'public figure' analysis in this case." Aside from *Foretich*, Tomczyk cites no other legal support for this proposition.

(continued)

least some of those protests were held at Tomczyk's IROW properties. Further, during this time, he conducted interviews with local news media promoting the protests, and he served on the board of directors of "Get Involved Wisconsin," an organization founded by Ellefson that "became the lead in organizing and promoting these protests." According to Tomczyk, to promote his first protest at IROW, he spoke with two local radio stations, which from the context of this statement made during Tomcyzk's deposition we understand to have been on air, "and after that, it just spread across the state," resulting in 1,500 to 3,000 people attending the protest.

---

We conclude that Tomczyk's assertion is incorrect. First, we are not bound by *Foretich*. *See City of Weyauwega v. Wisconsin Cent. Ltd.*, 2018 WI App 65, ¶12 n.4, 384 Wis. 2d 382, 919 N.W.2d 609 ("Although federal court decisions, other than United States Supreme Court decisions on questions of federal law, do not bind us, we may follow federal court decisions that we find persuasive."); *see also Wiegel v. Capital Times Co.*, 145 Wis. 2d 71, 79, 426 N.W.2d 43 (Ct. App. 1988) ("[S]tates are free to set their own standards of proof in media libel actions brought by private individuals."). Second, *Foretich* outlines "*five* requirements that the defamation defendant must prove before a court can properly hold that the plaintiff is a public figure for the limited purpose of comment on a particular public controversy." *Foretich*, 37 F.3d at 1553 (emphasis added). These are not the same standards that Wisconsin courts have identified. *See Bay View Packing Co. v. Taff*, 198 Wis. 2d 653, 677-78, 543 N.W.2d 522 (Ct. App. 1995). Finally, Tomczyk quotes *Foretich* for the statement that "whether a plaintiff is a public figure is determined 'at the time of the alleged defamation,'" but *Foretich*'s fifth requirement is actually whether "the plaintiff retained public-figure status at the time of the alleged defamation." *See Foretich*, 37 F.3d at 1553.

Accordingly, *Foretich* does not instruct that we are unable to consider Tomczyk's past community and political involvement. Instead, it appears that the closest consideration we have under the case law in this state is the "acknowledg[ment] that a public official [may] not automatically remain a public figure forever after leaving office." *See Biskupic*, 313 Wis. 2d 225, ¶¶21-24. Where the plaintiff was already prominent in the community or held public office, we consider whether there was a "special public interest" that "continued" or whether the plaintiff "left [public life] 'to drift quietly into oblivion.'" *See id.*, ¶¶21, 24 (citation omitted). We agree with Wausau Pilot that "[w]hen an individual has previously held public office or has been an active participant in community affairs over a number of years, that prominence is indisputably relevant to his or her ongoing status as a public figure." Thus, we conclude that Tomczyk's past community and political involvement is a proper consideration, but any events occurring after this alleged defamation, such as Tomczyk's election as a state senator, are not.

¶33    Even prior to the COVID-19 protests, Tomczyk had been an active member of the community.  He started IROW in 1989, which has since become, according to Tomczyk, "[n]orthern Wisconsin's largest supplier of certified document destruction serving a wide range of facilities."  In 2006, he was elected to the Mosinee County School Board, holding that position until 2019 and serving as the board president from 2010 to 2015.

¶34    In addition to his elected position on the school board, Tomczyk had also been involved in local politics and community affairs.  According to the record, Tomczyk served as the vice chair of the Republican Party of Marathon County from 2008 until 2015.  In fact, Megan testified during her deposition that she was aware of Tomczyk prior to the Community for All debate as "a well-known name in the Marathon County Republican Party."  From 2019 to 2022, Tomczyk also served as a board member of the Greater Wausau Chamber of Commerce.  Finally, he served on local boards for youth sports.

¶35    Based on these facts, it is clear that Tomczyk voluntarily "thrust" himself "to the forefront of" the Community for All debate "in order to influence the resolution of the issues involved."  *See Gertz*, 418 U.S. at 345; *see also Bay View Packing*, 198 Wis. 2d at 683.  He did so by attending the county board meetings and speaking out against both the resolution *and* the board itself, which brought particular attention to the divisive nature of the controversy and drew more attention to the debate than merely opposing the resolution would have. *See Bay View Packing*, 198 Wis. 2d at 684 ("Indeed, in some cases it is sufficient that a plaintiff 'voluntarily engaged in a course that was bound to invite attention and comment.'" (citation omitted)).

¶36     Tomczyk's then-recent involvement with the COVID-19 public controversy, his status as the owner of a well-known business in the community, his former position on the school board, and his status as a leader in the county's Republican Party also all served to elevate him beyond a private citizen in the eyes of the community.  In other words, Tomczyk stepped into the public spotlight, and his choice to involve himself in the community and in previous public controversies made him a leader that the public looked to for guidance on issues.  *See Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 33 (D.C. Cir. 1990) ("Clyburn engaged in conduct that he knew markedly raised the chances that he would become embroiled in a public controversy.").  Accordingly, Tomczyk's voice had influence beyond that of a private citizen, and he used that voice, in this instance, to "influence the resolution of the" Community for All debate.  *See Gertz*, 418 U.S. at 345.  While these facts support Wausau Pilot's claim that Tomczyk was a general purpose public figure, we conclude that they are properly considered when determining whether Tomczyk was a limited purpose public figure as well.

¶37     Moreover, Tomczyk was also drawn into this public controversy.  *See Bay View Packing*, 198 Wis. 2d at 683.  Tomczyk may not have intended to involve himself to such an extent in the Community for All debate, but his "activities 'almost inevitably put him into the vortex of a public controversy.'"  *See Wiegel*, 145 Wis. 2d at 85 (citation omitted).  For example, his picture was used in The New York Times article about the Community for All debate, suggesting that he was a public face of the opposition.  Additionally, the record demonstrates that Tomczyk's alleged use of the slur "invite[d] attention and comment" both on social media and at the August 19, 2021 meeting, with supporters of the resolution using the allegation against Tomczyk as evidence of

19

the need for the Community for All resolution.  *See Bay View Packing*, 198 Wis. 2d at 684.  Thus, to a certain extent, Tomczyk's involvement in the controversy was also involuntarily elevated by events outside of his control.

¶38    Wausau Pilot also argues that Tomczyk had "ready access to the media" to rebut the allegedly defamatory statements by virtue of his connection to Ellefson.  According to Wausau Pilot, "Tomczyk plainly had ample opportunity to turn to the media to rebut Wausau Pilot's alleged defamation—as underscored by the fact that he and local radio host Ellefson sat together at the August 12, 2021 meeting, Tomczyk made the comments at issue directly to her, and he has appeared on her show multiple times."

¶39    When considering whether a plaintiff has "injected himself [or herself] into the [public] controversy so as to influence the resolution of the issues involved," one factor is whether "the plaintiff's status is such that he [or she] has access to the media to rebut the defamation."  *Van Straten v. Milwaukee J. Newspaper-Publisher*, 151 Wis. 2d 905, 913, 447 N.W.2d 105 (Ct. App. 1989); *see also Wiegel*, 145 Wis. 2d at 88 (noting that access to the media in determining whether a person voluntarily entered into the public fray to rebut the alleged defamation is relevant but not "the touchstone" of the determination).  We agree that Tomczyk's demonstrated access to the media during the COVID-19 controversy, as well as his working relationship with Ellefson through Get Involved Wisconsin, supports Tomczyk's status as a limited purpose public figure.

¶40    In response, Tomczyk argues that "there is nothing in the record showing that Tomczyk was given media access to rebut the allegations made by Wausau Pilot."  Whether Tomczyk did or did not take advantage of media access is not the proper consideration.  The question is whether he "ha[d] access to the

media in order to rebut the defamation." *See Van Straten*, 151 Wis. 2d at 913. Given the evidence in the record regarding his prior media access, we agree that "[t]here is no reason to think that if" Tomczyk had approached the media "he would not have been able to give his version of relevant events." *See Sidoff*, 409 Wis. 2d 186, ¶48.

¶41     Tomczyk also asserts that he "was never an elected official in the summer of 2021 and he never took a vote on the Community for All resolution. His role was limited to that of a concerned citizen." While Tomczyk's status as an elected official or as one of the individuals voting on the resolution would likely factor into whether he qualified as a public official, these qualifications are not required of a *public figure*. *See Wagner v. Allen Media Broad.*, 2024 WI App 9, ¶¶51, 60-62, 410 Wis. 2d 666, 3 N.W.3d 758. In this case, Wausau Pilot does not argue that Tomczyk was a public official at the time of the Community for All debate; thus, we are concerned only with whether Tomczyk was a public figure.

¶42     Next, Tomczyk claims that he was merely "a private citizen" and that his attendance and comments at the public county board meetings "cannot transform a private citizen into a public figure." According to Tomczyk, he "was one of a large group of people who spoke publicly on the Community for All [r]esolution," and he questions whether the law would now consider "all of them" as limited purpose public figures. For support, he cites *Wiegel* for the proposition that "[a]n individual does not forfeit the full protection of the libel laws merely by stating a position on a controversial issue if he or she is not a principal participant in the debate or is unlikely to have much effect on its resolution." *Wiegel*, 145 Wis. 2d at 83 (citation omitted).

21

¶43 Initially, we note that we cannot simply accept Tomczyk's conclusory statement that he was a private citizen. As this court expressed in *Wiegel*,

> [t]he purpose served by protecting the press from defamation suits for comment on public issues and the people involved in those issues could well be frustrated if the individuals could, by themselves and wholly independent of their involvement in the controversy, determine whether they are, or are not, "public figures."

> Comment upon people and activities of legitimate public concern often illuminates that which yearns for shadow. It is no answer to the assertion that one is a public figure to say, truthfully, that one doesn't choose to be. It is sufficient … that "[the plaintiff] voluntarily engaged in a course that was bound to invite attention and comment."

*Wiegel*, 145 Wis. 2d at 85 (second alteration in original; citation omitted). As noted above, Tomczyk's prior involvement in the community and with political issues transformed his voluntary injection into the Community for All debate into something more than participation by a private citizen.

¶44 We also disagree with Tomczyk's characterization of his involvement in the public controversy. Beyond essentially claiming that he was merely one face in a large crowd of speakers—which suggests he is asserting that he was not a principal participant in the debate—Tomczyk fails to address why his public comments were "unlikely to have much effect on [the controversy's] resolution." *See id.* at 83 (citation omitted). As explained above, Tomczyk's role in the community and in politics placed him in a unique leadership position in the community. Tomczyk purposely "engage[d] the public's attention" by attending the public meetings and criticizing the county board "in an attempt to influence [the] outcome" of the Community for All debate. *See Gertz*, 418 U.S. at 352. Given that status, we cannot conclude on this record that Tomczyk was "not a

principal participant in the debate or [was] unlikely to have much effect on [the controversy's] resolution." *See **Wiegel***, 145 Wis. 2d at 83 (citation omitted).

¶45    The third step in our analysis of Tomczyk's role in the controversy addresses "whether 'the alleged defamation was germane to the plaintiff's participation in the controversy.'" *See **Bay View Packing***, 198 Wis. 2d at 684 (citation omitted).  On summary judgment, the circuit court concluded that "given that the stated purpose of the 'Community for All' resolution was to promote inclusivity, [Tomczyk's] alleged use of the slur would be germane to the resolution and to his participation in the controversy."

¶46    Wausau Pilot's articles focused entirely on the Community for All debate.  The articles detailed the divisive viewpoints, as demonstrated at the meetings and in messages received by county board supervisors, and included quotes from multiple individuals in support of the resolution, in opposition to it, and casting accusations at county leadership in response to leadership's support of the measure.  Tomczyk's alleged use of the slur was reported by Wausau Pilot within that context.

¶47    While the public controversy concerned the Community for All resolution, to determine whether the alleged defamation was germane to Tomczyk's participation in that controversy, it is important to understand the

Community for All resolution itself.[10] As best we can determine based on this record, the resolution, according to Siewert, "proposed proclaiming Marathon County as a community for all regardless of gender, color, [or] sexual orientation." We also presume that the circuit court properly found that "the stated purpose of the 'Community for All' resolution was to promote inclusivity," which means "including everyone" and "*especially*: allowing and accommodating people who have historically been excluded (as because of their race, gender, sexuality, or ability)." *See Inclusive*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/inclusive (last visited Sept. 5, 2024).

¶48 We conclude that the germaneness test has been met because the allegedly defamatory statements relate to Tomczyk's role in the public controversy. As noted, the slur allegedly used is an offensive term for a gay person. Accordingly, given that Tomczyk strongly opposed the resolution and that the resolution specifically identified sexual orientation as a consideration, we agree with Wausau Pilot's assertion that it reported the allegedly defamatory statements "'in connection with and to emphasize' the acrimony of the 'Community for All' debate and the sharply opposing viewpoints on issues of diversity, which would certainly encompass the use of an anti-gay slur." *See Bay View Packing Co.*, 198 Wis. 2d at 684-85.

---

[10] It does not appear that the Community for All resolution—of which there were apparently several iterations—was included in the record on appeal. It is the appellant's responsibility to ensure that the record on appeal is complete, and any missing material is presumed to support the circuit court's ruling. *Fiumefreddo v. McLean*, 174 Wis. 2d 10, 26-27, 496 N.W.2d 226 (Ct. App. 1993). At the very least, the parties have failed to cite the location in the record where the Community for All resolution's language is located. *See Grothe v. Valley Coatings, Inc.*, 2000 WI App 240, ¶6, 239 Wis. 2d 406, 620 N.W.2d 463, *abrogated on other grounds by Tews v. NHI, LLC*, 2010 WI 137, ¶72 n.21, 330 Wis. 2d 389, 793 N.W.2d 860 ("We decline to embark on our own search of the record, unguided by references and citations to specific testimony, to look for evidence to support [a party's] argument.").

¶49 Tomczyk claims, however, that "the defamation claim is not related to his participation in the debate" because "Wausau Pilot did not quote Tomczyk's public remarks or report on his views on the resolution." "Instead," he states, "[Wausau Pilot] published comments Tomczyk allegedly whispered to someone seated next to him and which had nothing to do with the public debate." According to Tomczyk, "[i]t is paradoxical to assert that one's alleged *private* comments are related to a *public* controversy. If Tomczyk had wanted the public's views to be swayed by the word …, he would have said it during either of his public comments."

¶50 Tomczyk's arguments are not persuasive. Initially, we note that Tomczyk cites no legal authority for his claim that allegedly private comments cannot be germane to a public controversy. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we need not consider arguments that are unsupported by references to legal authority).

¶51 Beyond that—paradoxical as it may be—we do not agree with Tomczyk's assertion. In *Van Straten*, the plaintiff—a jail inmate awaiting trial—attempted suicide by cutting his wrist and forearm. *Van Straten*, 151 Wis. 2d at 909. Van Straten never consented to disclosure of his medical information; nevertheless, the sheriff "informed reporters," who then published an article, "that jail personnel knew Van Straten was homosexual and that he exposed jailers to AIDS when he slashed his wrists during the suicide attempt." *Id.* Van Straten brought a defamation suit against several newspapers. *Id.* at 911. We concluded that Van Straten was a limited purpose public figure "so far as the events surrounding the suicide attempt [were] involved." *Id.* at 917. We stated:

> [T]here is no doubt that AIDS and the issue of how to deal with it in the jail system was a controversy of substantial interest, which affected persons beyond the immediate

25

> participants in the controversy at the Outagamie County Jail during the suicide attempt; that Van Straten's role in the controversy was neither trivial nor tangential; and that statements concerning Van Straten's sexual [orientation], the diagnosis of AIDS and the manner in which jailers came into contact with Van Straten's blood were germane to the controversy.

*Id.* at 916.

¶52    While the facts in ***Van Straten*** are obviously distinguishable from the facts in this case, we find the case informative. Tomczyk's assertion that private comments cannot be related to a public controversy does not seem to be accurate where we have previously determined that an individual's sexual orientation and medical diagnosis—two areas of life that are generally seen as private—were germane to a public controversy.

¶53    Tomczyk has presented us with no legal authority suggesting that the limited purpose public figure germaneness analysis involves a public versus private consideration. Instead, "[t]he purpose of the germaneness inquiry is to ensure that the allegedly defamatory statement—whether true or not—is related to the plaintiff's role in the relevant public controversy" so as not to protect "[m]isstatements wholly unrelated to the controversy." ***Jankovic v. International Crisis Grp.***, 822 F.3d 576, 589 (D.C. Cir. 2016) (citation omitted). Regardless, Tomczyk's allegedly "private" comment was seemingly made public because it was purportedly heard by others at the August 12, 2021 meeting. Tomczyk need not have allegedly said the slur in front of the entire county board meeting for it to be germane to the debate.

¶54    In summary, we conclude that the undisputed facts establish that Tomczyk was a limited purpose public figure for the purpose of the Community for All resolution. The resolution was a public controversy, Tomczyk's role was

neither trivial nor tangential, and the allegedly defamatory statements at issue were germane to his participation in the dispute. Therefore, to survive Wausau Pilot's summary judgment motion, Tomczyk was required to show a genuine issue of material fact as to whether the allegedly defamatory statements were made with actual malice.

## II. Actual malice

¶55   "If the plaintiff is determined to be a limited purpose public figure, the court must then determine whether the evidence in the summary judgment record could support a reasonable jury finding that plaintiff has shown actual malice." *Sidoff*, 409 Wis. 2d 186, ¶20 (citation omitted). "Proof of actual malice requires a showing that the defamatory falsehood was published with knowledge of its falsity or with reckless disregard for its truth." *Wagner*, 410 Wis. 2d 666, ¶46 (citation omitted). To demonstrate reckless disregard, the plaintiff "must show that the defendant[s] in fact entertained serious doubts as to the publication's truth." *Biskupic*, 313 Wis. 2d 225, ¶27 (alteration in original; citation omitted). "Actual malice must be proven by clear and convincing evidence." *Id.* "If the plaintiff does not meet this burden [to show actual malice], the defamation claim should be dismissed as legally insufficient because it is quite clear that under no circumstances can the plaintiff recover." *Sidoff*, 409 Wis. 2d 186, ¶20 (alteration in original; citation omitted).

¶56   The circuit court determined that Tomczyk could not establish that Wausau Pilot either knew that the allegedly defamatory statements were false or that it published the story while harboring serious doubts as to its truth. According to the court, the summary judgment record contained

> proof that Siewert received a message from Norah Brown about the slur[;] that she followed up by reviewing social

27

> media posts, several of which identified Tomczyk[;] that she reviewed a video recording of the meeting to confirm where people had been seated[;] and she saw messages exchanged on the night of the meeting by Norah Brown and Christine Salm, which also identified Tomczyk.

Thus, the court concluded that "[o]n this record, it is not possible to find that the [Wausau Pilot] had serious doubts about the truth of the publication."

¶57 We agree that Tomczyk presents no triable issue as to actual malice. Siewert's uncontested testimony is that she was "100 percent certain" that Tomczyk uttered the slur at the August 12, 2021 meeting. While Siewert's assertion that she believed the statements were true cannot *alone* defeat a claim that Wausau Pilot acted with actual malice, *see **St. Amant v. Thompson***, 390 U.S. 727, 732 (1968), as the circuit court recognized, the record supports the assertion that Siewert investigated the veracity of the allegation before publishing Tomczyk's name in the August 28 article. The evidence Siewert considered included: (1) the email between Siewert and Brown on August 18, 2021, in which Brown stated that "[a]n individual sitting behind" Brown and her son at the August 12 meeting had "referred to one of the other speakers and to [her] son using a slur (f**)";[11] (2) Salm's information that Brown heard Tomczyk use the

---

[11] Tomczyk asserts that "Wausau Pilot did not have a single source who heard Tomczyk use the slur when it named him in the August 28 article" on the basis of Brown's alleged testimony that Siewert did not call Brown. According to Siewert, however, she called Brown sometime between the August 21 and 28 articles to determine "whether or not [Brown] heard the slur." Siewert also said she called Brown a second time "after [she] found out [she] was being sued."

(continued)

28

slur (Siewert testified at her deposition that Salm was one of her "trusted source[s]" who has "consistently given [her] factual information time and time again"); (3) text messages between Salm and Brown exchanged during the August 12 meeting where Brown stated that "[t]he man behind me just referred to the speaker and then to my son as a [slur]" and that she "just glared at him"; (4) the video recording of the August 12 meeting, confirming that Tomczyk was seated behind Brown, showing Brown turn around to look at Tomczyk at one point during the meeting after it was clear he said something to the individual next to him, and revealing Brown texting shortly thereafter; and (5) social media posts discussing the incident and identifying Tomczyk as the speaker.

¶58    Given the steps Siewert took to verify the information, her testimony that Salm was a trusted source in the past, and her testimony that she was certain Tomczyk uttered the slur, we cannot conclude that Wausau Pilot *knew* that the allegation was false or even that it harbored any doubts as to that fact. Whether any of the above items of evidence *prove* that Tomczyk said the slur or not, and regardless of Tomczyk's claim that other evidence discovered later suggests that the allegedly defamatory statements were false, Siewert's investigation demonstrates why Wausau Pilot believed the statements were true and why that belief was not reckless. Tomczyk has not presented any evidence to call that conclusion into question.

---

Brown testified that Siewert "did call me at one point," but Brown did not "recall the conversation." According to Brown, as it pertained to *that* phone call, Siewert "did not call me asking about what I heard. She called to tell me that there was an issue." Overall, however, Brown was adamant that she could not recall the exact conversation and that she had "a lot more going on [in her life] than this" issue at the time. Thus, we are not convinced that Brown's testimony was unequivocal that Siewert *never* called her to confirm the story; instead, Brown seemed to only remember the second phone call. Nevertheless, there is no dispute that Siewert had Brown's email.

¶59     Instead, Tomczyk argues that "Wausau Pilot's conduct in publishing Tomczyk's name without any corroborating witnesses constitutes 'reckless disregard of the truth' as to whether Tomczyk was the person who used the slur." In essence, Tomczyk asserts that Wausau Pilot engaged in "journalistic malpractice" by "fail[ing] to investigate." As Wausau Pilot recognizes, however, "both Wisconsin courts and the [United States] Supreme Court have repeatedly held [that a failure to investigate] does not constitute actual malice." *See, e.g.*, *Storms*, 309 Wis. 2d 704, ¶78 ("[M]ere proof of failure to investigate the accuracy of a statement, without more, cannot establish the reckless disregard for the truth necessary for proving actual malice." (citation omitted)); *Gertz*, 418 U.S. at 332 (same). "A court's role is to interpret and apply the law, not to enforce standards of journalistic accuracy or ethics." *Torgerson*, 210 Wis. 2d at 552. Further, "[r]eckless disregard for the truth is not measured by what the reasonably prudent person would publish or investigate prior to publishing. Instead[,] it is a subjective standard." *Storms*, 309 Wis. 2d 704, ¶39.

¶60     Tomczyk does not address the above case law or cite any contrary legal authority in support of what appears to be his claim that "reckless disregard of the truth" can equate to a "failure to investigate." *See Pettit*, 171 Wis. 2d at 646. In lieu of addressing this issue, Tomczyk argues in his reply brief that "Wausau Pilot never grapples with the legion of inconsistencies in the statements of the four witnesses it is relying on to support its publications on August 21

and 28 which attributed use of the [slur] to Tomczyk."[12] Tomczyk argues these inconsistencies establish that the allegedly defamatory statements were not "substantially true"—an issue we need not reach in this case, *see **Bay View Packing**,* 198 Wis. 2d at 687 ("'[S]ubstantial truth' is the ultimate defense to a defamation action."). Further, Tomczyk does not repeat his claim that Wausau

---

[12] As noted previously, *see supra* note 5, other witnesses testified at depositions and/or submitted affidavits stating that they heard Tomczyk use the slur. Tomczyk identifies alleged inconsistencies in the reports about when Tomczyk said the slur and what exactly was said. For example, Tomczyk compares Brown's affidavit and deposition testimony—claiming that Tomczyk said the alleged slur around 4:14 p.m.—with Megan's affidavit and testimony— asserting that she heard Tomczyk use the slur when Brown's son was speaking. According to Tomczyk, this was a fifty-minute difference.

Carrie's affidavit also stated that she heard Tomczyk use the slur "[a]bout half-way through the meeting, while a younger person was speaking." However, Carrie testified at her deposition that Tomczyk used the slur "during the meeting," but she "d[id] not recall at what point during the meeting." Carrie explained that she "just remember[ed] it being a younger person because [she] thought it was inappropriate that somebody would call somebody that's younger a [slur]." Also, Tomczyk points out that both Megan and Carrie were unsure if they heard Tomczyk use the slur or a longer version of the slur. Nevertheless, both testified that they heard Tomczyk use the slur.

Finally, Heaton stated in his affidavit:

> At one point during the meeting, I heard Mr. Tomczyk refer to one of the community members speaking in favor of the resolution as a "[slur]" or "[longer slur]." I also observed the woman sitting immediately in front of Mr. Tomczyk turn and say something to Mr. Tomczyk. Soon after that exchange, Mr. Tomczyk stormed out of the meeting before it had ended.

In response, Tomczyk argues that "Brown never testified that she said anything to Tomczyk and the video from the evening showed Tomczyk calmly leaving at 6:12 p.m., long after the public comments period ended." Tomczyk's assertions, however, are not supported by the evidence in the record. First, Brown *did* testify that "[a]t one point [she] turned around to [Tomczyk] and the woman behind [her] and asked them to stop talking" because "[t]hey were talking throughout the meeting." She could not recall, however, when this occurred. Second, Tomczyk states that "the video from the evening *showed*" him "calmly leaving," but the video available on YouTube does not show Tomczyk leaving at all. (Emphasis added.) Instead, Tomczyk cites a still photograph from a video in the record with Tomczyk standing in the audience, facing the door. There is no way to tell from that photograph if Tomczyk is calm or upset, but it is clear that Tomczyk left before the county board meeting had concluded.

Pilot "failed to investigate" the allegations before publishing the articles in his reply brief. Therefore, we are unsure whether he is claiming that the alleged "legion of inconsistencies" demonstrates a lack of investigation or reckless disregard for the truth.

¶61 Regardless of which of the foregoing claims Tomczyk makes, the existence of other inconsistent evidence does not erase the value of Siewert's actual investigation under the actual malice standard. Furthermore, it appears that the affidavits and deposition testimony of Megan, Carrie, and Heaton were collected as part of this litigation, and, therefore, Tomczyk fails to present evidence that Siewert was aware of any alleged inconsistencies—such that Wausau Pilot may have harbored doubts as to the truth of its statements—when the articles were published.

¶62 Instead, Tomczyk points to the following information that he asserts "was the path Wausau Pilot took to 'confirm' that" Tomczyk uttered the slur: (1) Jayshi did not attend any of the county board meetings on which he reported, relying instead on the YouTube recordings; (2) Jayshi did not interview any sources or witnesses for the articles; (3) Jayshi did not know the identity of the individual who used the slur when the first article was published on August 21, 2021; (4) "Sondergard was falsely quoted as saying she 'witnessed' a local businessman use the [slur]"; (5) "[b]oth articles misleadingly suggest that another speaker … acknowledged that Norah Brown's son was called a [slur]"; (6) Siewert relied on Pat Peckham—a community member and retired journalist—as a "trusted source" to confirm that Tomczyk said the slur, but Peckham's information was "nothing more than hearsay and unidentified gossip"; and (7) "Siewert violated her own journalist rule, which is to confirm a quote with two sources who

have first-hand knowledge," because "she admitted to relying on only one [source]: Norah Brown."[13]

¶63 Aside from listing the above points, Tomczyk does not identify how they impact the actual malice analysis in this case. For example, his assertions regarding Jayshi, while perhaps relevant to argue a reckless disregard for the truth generally, are not material where the evidence establishes that Siewert added the sentence regarding Tomczyk to the article and also fact checked the story prior to publication to confirm its truth. Siewert testified at her deposition that "Brown wasn't one of [Jayshi's] sources in his reporting"; instead, Brown "was someone [Siewert] consulted as part of the fact-checking process." On the other points, the presence of allegedly false information in the articles about *other individuals* is not relevant to Tomczyk's defamation claim,[14] Wausau Pilot does not assert on appeal that it relied on Peckham's information, and Siewert's alleged violation of her "own journalist rule" does not determine actual malice. *See Torgerson*, 210 Wis. 2d at 552. Furthermore, Tomczyk fails to specifically address Wausau Pilot's asserted investigation or argue that there were "obvious reasons to doubt" Brown's and Salm's information and the posts on social media based on "the

---

[13] Siewert's deposition testimony suggesting that two sources would be needed to confirm a quote was in response to Tomczyk's counsel's hypothetical about an event where no one on Wausau Pilot's staff attended the event and there was no transcript or video available. When counsel attempted to confirm that Siewert's "rule is you need two sources to confirm a quote," Siewert was clear that she could not "answer yes or no to that because it depends on the situation. It would depend on the context. It would depend on so many other things…. There are so many factors involved here, and every story is different."

[14] Sondergard did not clearly state in her speech that she was *not* one of the "[s]everal people around him" that heard Tomczyk say the slur, and she also did not say it was Tomczyk who said it. *See supra* ¶10. Regardless, whether Sondergard heard the slur directly or not, Wausau Pilot did not publish the allegedly defamatory statements about Tomczyk relying only on Sondergard's statement at the August 19, 2021 meeting.

veracity of the informant or the accuracy of [the] reports." *See Anderson v. Hebert*, 2011 WI App 56, ¶22, 332 Wis. 2d 432, 798 N.W.2d 275 (citation omitted); *see also Biskupic*, 313 Wis. 2d 225, ¶31. Tomczyk does not suggest or present evidence in the record that *Brown* was an untrustworthy source.

¶64     Tomczyk then asserts that "Siewert's desire to publish an unsourced story was likely colored by her long-running disdain for Tomczyk, a man she has labelled 'gross,' an 'asshole,' and a 'dick head.'"[15] As Wausau Pilot identifies, however, "Tomczyk's characterization of Siewert's so-called 'palpable disdain' for him" does not "come close to meeting the actual malice standard." "The focus" of the actual malice standard "is upon the defendant's attitude pertaining to the truth or falsity of the published statements rather than upon any hatefulness or ill-will." *Bay View Packing*, 198 Wis. 2d at 686-67 (citation omitted); *see also Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991) ("Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will."); *Torgerson*, 210 Wis. 2d at 536 ("Actual malice is a term of art; it is not used in its ordinary meaning of evil intent."). We agree with Wausau Pilot that Siewert's alleged "disdain" for Tomczyk has no bearing on whether she believed that the information contained in the articles was true and, without more, does not establish recklessness.

---

[15] We note that it does not appear from the record that Siewert called Tomczyk "gross." Siewert testified at her deposition that the comment, contained in a text message, was in reference to the anti-mask rally organized by Tomczyk that was held during the COVID-19 pandemic, not Tomczyk himself.

¶65    Finally, Tomczyk claims that "[a]t the very least, this issue presents a factual question that could not be resolved on summary judgment." He cites *Anderson* for the proposition that "whether the failure to investigate allegations rises to the level of reckless disregard for the truth presents a factual question for the jury." *See Anderson*, 332 Wis. 2d 432, ¶25. One of the issues on summary judgment in *Anderson* was whether the Barron County administrator's allegedly defamatory statements about Anderson, a former Barron County Highway Department patrol superintendent, to the local media and in an open meeting of the county board were made with actual malice. *Id.*, ¶¶2-5, 21. The court held that a reasonable jury could conclude that the administrator had reason to doubt the veracity of the allegations against Anderson, which provided the basis for his claims to the media and to the board, such that the jury could find actual malice. *Id.*, ¶¶3, 23-26.

¶66    *Anderson* does not stand for the general proposition that actual malice is always a jury question and cannot be resolved on summary judgment. The *Anderson* court merely determined that there were triable issues of fact in that case and denied summary judgment on that basis. Tomczyk fails to further develop an argument demonstrating how the factual circumstances in *Anderson* are similar to those here, such that we should reach the same conclusion. *See Pettit*, 171 Wis. 2d at 646-47.

¶67    In summary, Tomczyk, a limited purpose public figure, has not presented evidence by which a reasonable jury could conclude that Wausau Pilot harbored serious doubts about the truth of the publications such that it acted with actual malice in publishing them. Accordingly, Tomczyk's defamation claim

against Wausau Pilot fails. We therefore affirm the circuit court's order dismissing Tomczyk's claims.[16]

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.

---

[16] Wausau Pilot also argues that we should affirm the circuit court because the allegedly defamatory statements are substantially true; the statements—which were reporting on events at a government proceeding—are "protected by the Fair Report Privilege" under WIS. STAT. § 895.05(1); and the order "must additionally be affirmed as to Jayshi because of Tomczyk's failure to comply with Wisconsin's retraction statute" under § 895.05(2). Given that we affirm the court based on Tomczyk's failure to establish actual malice, we do not address Wausau Pilot's other arguments. *See Patrick Fur Farm, Inc. v. United Vaccines, Inc.*, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 (stating that "we decide cases on the narrowest possible grounds").